The STATE OF MONTANA, ex rel., FREMONT H. EAS-
BEY, Relator and Respondent v. The HIGHWAY PA-
TROL BOARD of the STATE OF MONTANA, and ROY
SORRELLS, as Chairman and Member of said Highway
Patrol Board of the STATE OF MONTANA, STANLEY
HALVORSON, OTIS WATERS, GEORGE GOSMAN and
TED JAMES, as Members of said Highway Patrol Board
of the STATE OF MONTANA, and ALEX B. STEPHEN-
SON, as Supervisor of the Highway Patrol of the
STATE OF MONTANA, Respondents and Appellants.

No. 10334.
Submitted November 8, 1961. Decided June 11, 1962.
372 P.2d 930.

384

Paul Reynolds, Helena (argued orally), for appellants.

Ralph J. Anderson and Stanley P. Sorenson, Helena (argued orally), for respondent.

MR. JUSTICE ADAIR delivered the Opinion of the Court.

This is an appeal from a judgment of the District Court for Lewis and Clark County.

The facts are not in dispute. They are of general notoriety. They concern the duties, responsibilities, rights, privileges and powers that lawfully attach to the office of the Lieutenant Governor of this State.

At the general election held November 8, 1960, the Honorable Tim M. Babcock was duly elected Lieutenant Governor of the State of Montana and, on December 5, 1960, he qualified as Lieutenant Governor by taking and subscribing the official oath of office prescribed in section 1 of Article XIX, of the Constitution of Montana. The articles and sections hereafter mentioned, unless otherwise indicated, are those of the Constitution of Montana.

Section 1 of Article VII, in part, provides that the Lieutenant Governor "shall hold his office for four years; or until his successor is elected and qualified, beginning on the first Monday of January next succeeding his election * * *."

On January 2, 1961, being the first Monday of January next succeeding his election, Lieutenant Governor Tim M. Babcock entered upon the performance of the many and varied duties of the office to which he had been elected. His initial duties commenced and were performed in the Senate Chamber of the Thirty-seventh (1961) Legislative Assembly of the State of Montana.

In Section 15 of Article VII of the Constitution it is *"expressly directed or permitted"* and provided that: "The lieutenant-governor shall be president of the senate, but shall vote only when the senate is equally divided."

The *powers* which are to be exercised and the *duties* which are to be performed by the Lieutenant Governor while functioning as "president of the senate" are to be exercised and performed in the Senate, being the first branch or upper house of Montana's Legislative Assembly. These *powers,* so exercised as "president of the senate," are largely legislative in character, but when the Senate is "sitting as a court of impeachment" (Section 1 of Article VIII, Mont.Const.) the *powers* there exercised are judicial in their nature.

Section 6 of Article V provides: "The legislative assembly * * * shall meet at the seat of government at twelve o'clock noon, on the first Monday of January, next succeeding the general election provided by law, and at twelve o'clock noon, on the first Monday of January of each alternate year thereafter * * *."

At twelve o'clock noon on January 2, 1961, the Honorable Tim M. Babcock, as Lieutenant Governor and President of the Senate, in compliance with the mandates of section 15 of Article VII and section 6 of Article V of the Constitution, called the Senate of the Thirty-seventh Legislative Assembly of the State of Montana (1961) to order and thereafter, for the entire sixty days of the session, he presided in the Senate and there discharged the duties assigned to and required of him by the Con-

stitution and statutes of Montana and by the duly adopted and published rules of the Senate.

*House Bill No. 342.* On January 21, 1961, Representatives Beam, Wayrynen, Hazelbaker, Emmons and Broeder, jointly introduced in the House of Representatives of the 1961 Legislative Assembly, House Bill No. 342 and, on February 14, 1961, such bill duly passed in the House on third reading by a roll call vote taken, by "ayes" and "noes", of the 94 representatives then comprising the House which vote resulted in 84 "ayes" and 8 "noes" with 2 representatives excused, absent and not voting. The votes so given and made, together with the names of all those voting and of all those entitled to vote, were entered on pages 432 and 433 of the printed House Journal of the Thirty-seventh State Legislative Assembly, as is provided for in Section 24 of Article V of the Constitution.

On February 24, 1961, the Senate adopted a report of its Committee on Finance and Claims amending, in various particulars, both the title and the substance of House Bill No. 342, and the account of such action and proceedings was duly entered on page 470 of the printed Senate Journal of the 1961 Legislature.

The House concurred in the Senate's amendments to House Bill No. 342 by a roll call vote taken by "ayes" and "noes", which resulted in 63 "ayes" and 26 "noes" with 4 representatives excused and not voting whereupon such vote, together with the names of all those voting and all those entitled to vote was duly entered on page 588 of the printed House Journal of 1961, as is provided for in Section 24 of Article V of the Constitution.

On February 25, 1961, the Senate, with all except two of the Senators present and voting, concurred in House Bill 342, as amended. There was a roll call vote taken by "ayes" and "noes", which votes, together with the names of all those voting and all those entitled to vote, were duly entered on page 502 of the printed Senate Journal of 1961, as is provided for in

Section 24 of Article V of the Constitution. The Senate Journal entry made of such vote and proceedings reads:

"House Bill No. 342, having been read three times, was concurred in by the following roll call vote:

"Ayes: Balgord, Beley, Bovey, Cashmore, Cole, Cumming, Durkee, Dussault, Goodwin, Graham, Groff, Harken, Hibbs, James, Keller, LaCombe, Lehrkind, Mackay, Manning, McGowan, McKeon, Rostad, Sagunsky, Siderius, Thiessen, Thomas, Ullom. Total 27.

"Noes: Anderson, Brenner, Brownfield, Carney, Cook, Cotton, DeWolfe, Edwards, Grieve, Hafferman, Hauk, MacDonald, Mahoney, McDonnell, McKenna (Judith Basin), McKenna (Fergus), Michels, Morrow, Nees, Nixon, O'Neill, Reardon, Rice, Rieder, Schoonover, Shaw, Stein. Total 27.

"Absent and not voting: None.

"Excused: Newman, Wilson. Total 2.

"Being a tie vote, President Babcock voted aye and House Bill No. 342 was concurred in."

On March 1, 1961, House Bill No. 342, as amended, together with a copy thereof, signed in open session by both the Speaker of the House and the President of the Senate, was delivered to the Governor for his approval.

On March 16, 1961, House Bill No. 342, as amended, was approved and signed by Governor Donald G. Nutter and thereupon it was duly and regularly filed in the office of the Secretary of State of Montana, whereupon such enactment became and now is Chapter 249 of the Montana Session Laws of 1961, pages 703-705, entitled:

"An Act to Amend Section 31-135, Revised Codes of Montana, 1947, Relating to Issuance of Driver's Licenses; to Provide That Driver's Licenses Shall Contain a Photograph of the Operator or Chauffeur in Such Form and Size as the Montana Highway Patrol Board Shall Prescribe; to Provide for An Increase in the License Fee from Three Dollars ($3.00) to Four Dollars

($4.00) ; Repealing All Acts and Parts of Acts in Conflict Herewith.''

The effective date of Chapter 249, supra, was the first day of July 1961.

*Action Commenced.* On June 29, 1961, being but *two days* before Chapter 249, supra, was to take effect, the relator, Fremont H. Easbey, filed in the District Court for Lewis and Clark County, a pleading which he termed an ''Affidavit and Application for Alternative Writ of Prohibition'' wherein the relator Easbey petitioned for the issuance of a writ of prohibition and an order to show cause against the respondents whom he named in his ''Affidavit and Application'' viz.: The Highway Patrol Board of the State of Montana; the Chairman and the individual members of that Board and Alex B. Stephenson, as Supervisor of the Highway Patrol of the State of Montana.

*Relator's Pleading.* In his ''Affidavit and Application'' for the above-mentioned writ, the relator, Fremont H. Easbey, being duly sworn, deposed and pleaded:

That he is a taxpayer in and a resident and citizen of the State of Montana and the holder of a valid driver's license issued to him by the State of Montana which license was to expire on December 3, 1961; that he is a person beneficially interested in the proceeding which he brings for and on behalf of himself and all other persons similarly situated.

Relator's ''Affidavit and Application'' further stated: That the vote on House Bill No. 342, supra, on third and final reading in the Senate was a tie and that the Lieutenant Governor, who was then presiding as President of the Senate, purported and pretended to cast the deciding vote therein; that in truth and fact * * * House Bill No. 342 was void, invalid and of no effect by reason of the fact that the purported passage thereof by the Senate * * * was and is contrary to section 24 of Article V of *the Constitution of the State of Montana* which provides as follows, to-wit:

'' 'No bill shall become a law except by a vote of a majority

of all the members present in each house, nor unless on its final passage the vote to be taken by ayes and noes, and the names of those voting be entered on the journal.' "

In his "Affidavit and Application" the relator, in substance, further alleged: That notwithstanding that Chapter 249, Laws of 1961, is void, the respondents named in relator's affidavit, unless prohibited from so doing by the court, intend to and will prescribe a size and form for and require a photograph of each licensee on licenses for operators and chauffeurs issued under and pursuant to section 31-135, R.C.M.1947, and will require the payment of the fee of $4.00 for the issuance of such licenses.

The relator's "Affidavit and Application" then stated: "That the requiring of such photograph will result in the expenditure of large sums of the public moneys of the State of Montana created and raised by taxation upon the relator and upon the other taxpayers of the State of Montana and that your relator and other persons in the State of Montana holding valid operator's or chauffeur's licenses will be required upon renewal of said licenses to have taken a photograph as aforesaid for placing upon said licenses at great public expense, all of which said actions and acts will be void and invalid by reason of the facts aforesaid; that there is no adequate nor any remedy at law to prevent the said void and invalid acts and actions on the part of the said respondents herein; that your relator has been forced to and has retained * * * attorneys duly licensed and admitted to practice law in the State of Montana, for the purpose of bringing this proceeding and that your relator is informed and believes and therefore alleges that the sum of $1,000 is a reasonable attorneys' fee to be allowed to your relator in this proceeding."

*Prayer for Relief.* The relator Easbey concluded his "Affidavit and Application" with the prayer: That the District Court issue a writ of prohibition prohibiting the aforesaid respondents from any further proceedings under or pursuant to Chapter 249, supra, until further order of the Court; that said

respondents be ordered to show cause, at a time and place certain, why they should not be absolutely restrained from any further proceedings pursuant to Chapter 249, supra, and that the relator have and recover of the respondents, the relator's costs and also a reasonable attorney fee for bringing the proceeding.

*Ex parte Order Issued.* Upon the reading of relator's affidavit the District Judge, on June 29, 1961, issued an *ex parte* order directing that an alternative writ of prohibition, returnable on a day certain, be issued and served upon all the respondents named in relator's "Affidavit and Application" and this was done.

*Motion to Quash.* The respondents thereupon interposed and argued a timely motion to quash the writ so issued against them The motion was based upon the grounds that neither the writ of prohibition issued nor the relator's "Affidavit and Application" therefor state facts sufficient to constitute a cause of action against any of the respondents or sufficient to warrant the granting of any relief whatever to the relator Easbey.

*The Judgment.* The District Court denied the motion to quash and ordered the respondents to answer instanter. The respondents, having elected to stand upon their motion to quash, declined to answer instanter, whereupon the District Court, on July 27, 1961, made and caused to be entered its judgment and order for the issuance of a peremptory writ of prohibition commanding, *inter alia,* that all the aforesaid respondents desist and refrain:

From any further proceedings pursuant to the provisions of Chapter 249, Montana Session Laws of 1961;

From requiring a payment of $4.00 for the issuance of driver's licenses to operators and chauffeurs; and

From requiring that a photograph of applicants for driver's licenses be placed upon such licenses or from prescribing a size and form of such photograph.

The District Court further ordered and adjudged that the

relator Easbey have and recover from the respondents the costs incurred by the relator Easbey in the sum of $10.70 together with the further sum of $1,000 as and for attorney's fees.

On July 28, 1961, the clerk of the trial court issued a peremptory writ of prohibition conforming to the above judgment and order which writ was duly served upon the respondents named in the proceedings in the trial court.

This is an appeal taken by such respondents from the judgment and order so entered against them.

On this appeal the respondents named in the proceedings in the District Court have become *the appellants* herein and the relator Easbey, who instituted the proceedings in the trial court, has become *the respondent* in the Supreme Court, but in this opinion we shall continue to refer to Fremont H. Easbey as *the relator,* and we shall refer to the respondents in the District Court as *the appellants* in this, the Supreme Court.

*The Question.* The question of law involved in this appeal is whether or not the Lieutenant Governor of the State of Montana, while presiding as President of the Senate, possessed the requisite *power* to enable or entitle him to cast the deciding vote on the third reading of House Bill No. 342, as amended, at a time when the Senators, then present and voting, were equally divided.

The people of Montana have specifically supplied the answer to the above question in their Constitution wherein they have *"expressly directed or permitted"* and conferred various *special powers* on the Lieutenant Governor, not the least of which, is *the power,* right and high privilege of presiding over the sessions and meetings of the State Senate as its President with the *express direction* that, while so presiding, he *"shall vote only when the senate is equally divided."* Section 15, Article VII, Constitution of Montana.

"This is a wise recognition of the parliamentary principle which allows a presiding officer the authority of holding a balance of power between equally divided votes of a deliberative

body, in order to facilitate, but not to block, legislation; or * * * for breaking, but not for making, a tie vote." Brown v. Foster (1895), 88 Me. 49, at p. 54, 33 A. 662, at p. 664, 31 L.R.A. 116, at p. 118.

In 40 A.L.R. at p. 808, it is said: "The usual method provided to end a deadlock or tie in governmental bodies is to place in the hands of some designated person or official, who may or may not be a member thereof, *the power* to cast a deciding vote." Emphasis supplied.

Conventionally, the presiding officer of a body does not have a vote *except in case of a tie.* Outstanding examples are: (1) The Vice-President of the United States concerning whom the Constitution of the United States, in section 3 of Article I, says: "The vice-president of the United States shall be president of the senate, *but shall have no vote, unless they be equally divided.*" (2) The Lieutenant Governor of Montana concerning whom the Constitution of Montana, in section 15 of Article VII, says: "The lieutenant-governor shall be president of the senate, *but shall vote only when the senate is equally divided.*"; and (3) the mayors of cities as was considered and determined by this court in State ex rel. O'Hern v. Loud (1932), 92 Mont. 307, 14 P.2d 432. The power and right conferred *to cast a deciding vote* in all cases where the Senate is "equally divided" does not, of itself, make of the Vice-President of the United States a United States Senator nor does it make of the Lieutenant Governor of Montana, a State Senator. Likewise, in O'Hern's case, supra, the *power* conferred upon the mayor to *"decide by his vote all ties"* did not make of the Mayor of Miles City an alderman. See: City of Carrollton v. Clark (1886), 21 Ill.App. 74, 75; Siegel v. City of Belleville (1932), 349 Ill. 240, 181 N.E. 687; Grimes v. Miller (1934), 113 N.J.L. 553, 175 A. 152.

The Constitution of Montana is largely patterned after the early Constitution of the State of New York (1777) and the subsequently drafted Constitution of the United States (1787).

The Constitutions of New York and Montana, as well as the

Constitutions of most of the other states of the Union *expressly* provide that the Lieutenant Governor shall be the presiding officer of the Senate and that he shall have a *casting vote* therein in case of a tie.

*New York's Constitution.* This specific blending or tying of the executive and legislative departments together, by providing that the second man in executive rank should preside over the Senate, originated in the early Constitution of the State of New York (1777), which, so far as pertinent here, provided:

"I. This convention, therefore, in the name and *by the authority of the good people of this State,* DOTH ORDAIN, DETERMINE, AND DECLARE that no authority shall, on any pretence whatever, be exercised over the people or members of this State but such as shall be derived from and granted by them. Emphasis supplied.

＊　＊　＊　＊　＊　＊　＊

"XX. That a lieutenant-governor shall, at every election of a governor, and as often as the lieutenant-governor shall die, resign or be removed from office, be elected in the same manner with the governor, to continue in office until the next election of a governor; and *such lieutenant-governor shall, by virtue of this office, be president of the senate, and, upon an equal division, have a casting voice in their decisions, but not vote on any other occasion.* Emphasis supplied.

"And in case of the impeachment of the governor, or his removal from office, death, resignation, or absence from the State, the lieutenant-governor shall exercise all the power and authority appertaining to the office of governor, until another be chosen, or the governor absent or impeached shall return, or be acquitted. ＊ ＊ ＊"

Thus New York became the first to find employment for its Lieutenant Governor by making him President of the Senate.

The current Constitution of the State of New York, as amended and in force since January 1, 1954, in section 14 of Article 3 and in section 6 of Article 6, thereof provides:

N.Y. Article 3, § 14. "No bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar days prior to its final passage, * * * *nor shall any bill be passed or become a law, except by the assent of a majority of the members elected to each branch of the legislature;* and upon the last reading of a bill, no amendment thereof shall be allowed, and the question upon its final passage shall be taken immediately thereafter, and the ayes and nays entered on the journal." Emphasis supplied. Compare with Section 24, of Article V, Constitution of Montana.

N.Y. Article 4, § 6. "The lieutenant-governor shall possess the same qualifications of eligibility of office as the governor. *He shall be president of the senate, but shall have only a casting vote therein.* * * *"* Emphasis supplied. Compare with Section 15, Article VII, Constitution of Montana.

At the time the Federal Convention met, New York was the only state with any such provision in its Constitution as that provided in the above-quoted Article XX of New York's Constitution of 1777, hence, New York is credited with supplying the idea for that part of the Constitution of the United States (1787) which, in section 3 of Article I, *expressly* provides: "The vice-president of the United States shall be president of the senate, *but shall have no vote, unless they be equally divided.*" Emphasis supplied.

This is the source of the "casting vote" of the Vice-President of the United States which *power* has been exercised on numerous and divers occasions and propositions throughout the years.

The first instance of record where the Vice-President was called upon to give a *"casting vote"* in the Senate of the United States was in the First Congress, July 18, 1789 (Journal p. 42), and on that occasion the Secretary of the Senate propounded to the Vice-President the question and called his name. A like procedure for casting the *"casting vote"* of the President of Montana's Senate is expressly provided in Section 5 of Rule

IV of the published "Rules of the Senate", page 10, determined, adopted and published by the Senate of the Thirty-seventh Legislative Assembly (1961) of the State of Montana.

The instances where the Vice-President of the United States has voted since July 18, 1789, to determine a question or proposition that was *balanced by a tie vote,* are far too numerous to here recite. John Adams, our first Vice-President, by the exercise of the *power* so expressly conferred upon him, thus *turned the scales* in the Senate twenty-nine times and John C. Calhoun, while Vice-President of the United States and President of the Senate, voted therein twenty-eight times.

In Volume 5 of Hinds' Precedents (1907) at p. 518, it is said: "5976. The Vice-President votes on *all questions* wherein the Senate is *equally divided,* even on a question relating to the right of a Senator to his seat." Emphasis supplied.

Kentucky, in 1799, in her second Constitution, Art. 3, § 17, made the Lieutenant-Governor the "Speaker" of the Senate, with a *casting vote,* and also *empowered* him "when in committee of the whole, to debate and vote on all subjects." This in turn was copied by: Indiana in 1816—Mississippi in 1817, Illinois in 1818 and Michigan first in 1835 and again in 1850.

Connecticut in 1818, likewise copied from Kentucky's Constitution, with the exception of that portion *empowering* the Lieutenant-Governor to vote in Committee of the Whole, which latter *power* was omitted in Connecticut's Constitution. Missouri in 1820 followed the Connecticut modification and added the *casting vote* in joint votes of the two Houses.

The Constitutions of many other states provide for a Lieutenant-Governor who shall be the presiding officer of the Senate with the *power to vote only when the Senate is equally divided.* Among these additional states are: Alabama; Arkansas; California; Colorado; Delaware; Idaho; Iowa; Louisiana; Montana; Nevada; New Mexico; North Carolina; North Dakota; Ohio; Pennsylvania; South Carolina; South Dakota; Virginia; Vermont; Washington and Wisconsin.

*Federal Constitution.* Section 5 of Article I of the Constitution of the United States, in part provides: *"Each house may determine rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member."* Emphasis supplied.

Comparable provisions appear in Section 11 of Article V of the Constitution of Montana, which, in part, provides: *"Each house* shall have power to *determine* the *rules of its proceedings,* and *punish its members* or other persons for contempt or *disorderly behavior* in its presence; * * * *and with the concurrence of two-thirds,* to *expel a member,* and shall have all other powers necessary for the legislative assembly of a free state. * * *"* Emphasis supplied.

RULES OF THE SENATE. In the exercise of the *powers* so expressly vested in it by Section 11 of Article V, supra, the Senate of Montana's Thirty-seventh Legislative Assembly (1961) determined, adopted, and published twenty-six separately numbered rules, some of which have numerous subsections, governing the Senate's proceedings which "Rules of the Senate," so far as pertinent here, read:

### "RULE II PRESIDENT OF SENATE

"1. PRESIDENT OF SENATE. The *lieutenant-governor* shall be president of the Senate. (Const. Art. VII, § 15; § 130, R.C.M.1935).

### "DUTIES

"2. CONVENING SENATE. The President shall *take the chair* on every legislative day precisely at the hour to which the Senate shall have adjourned at the last sitting, immediately *call the members to order* and, after *prayer* by the Chaplain and *roll call,* on the appearance of a *quorum,* cause the proceedings of the last day's sitting to be read, having previously examined the same.

"3. PRESERVE ORDER. He shall *preserve order and decorum,* and in case of disturbance or disorderly conduct in the galleries or lobbies, may cause the same to be cleared.

"4. RIGHT TO VOTE. He shall have the right to *decide a tie* on any proposition being voted. (Const., Art. VII, § 15).

"5. CONTROL OF ROOMS. The rooms, passages and buildings set apart for the use of the Senate shall be under the *control and direction* of the President of the Senate and he may assign places to reporters.

"6. CONTROL OF OFFICERS AND EMPLOYEES. The President shall see that all officers and employees of the Senate shall perform their respective duties.

"7. SETTLE DISPUTES OR COMPLAINTS. In all cases where *disputes* or *complaints* arise, or where questions of competency, decorum or discipline are involved concerning employees hired by the Committee on Employment of the Senate, the President shall *refer* such matters to the Committee on Employment for final determination and such committee shall report its action to the Senate.

"8. DECIDE QUESTIONS OF ORDER. The President shall *decide all questions of order,* subject to an appeal by any member, upon which appeal no member shall speak more than once, unless by permission of the Senate.

"9. DECISION ON QUESTION NOT BEFORE SENATE. It is not the duty of the President to decide any question which is not presented in the course of the proceedings of the Senate.

"10. SIGN BILLS, JOINT RESOLUTIONS AND JOINT MEMORIALS. The President shall, in the presence of the Senate, sign all bills, joint resolutions and joint memorials passed by the legislative assembly immediately after their titles have been publicly read, and the fact of signing shall be at once entered upon the Journal. (Const. Art V, § 27.)

"11. SIGN WRITS, WARRANTS, SUBPOENAS. The President shall sign all writs, warrants and subpoenas of or issued by the order of the Senate.

"12. NAME TEMPORARY PRESIDING OFFICER. The President shall have the right to name any Senator to perform the duties of the Chair, when the president pro-tem is not pres-

ent in the senate chamber, and such Senator who is so named is hereby vested during such time with all the powers of the President; but such Senator shall not lose the right of voting on any question while so presiding.

\* \* \* \* \* \* \*

"RULE IV
"Secretary of the Senate
"DUTIES

\* \* \* \* \* \* \*

"5. CAST VOTE OF PRESIDENT. When the Senate is equally divided, the Secretary shall take the decision of the President.

\* \* \* \* \* \* \*

"RULE XXVI

\* \* \* \* \* \* \*

"3. AUTHORITY ON RULES—NATIONAL HOUSE OF REPRESENTATIVES. In all cases not provided for in these rules the proceedings of the Senate shall be governed by the parliamentary law, procedure and practice set forth in the rules of the national House of Representatives, adopted in 1945 and used therein."

Section 82-1701, Revised Codes of Montana of 1947, provides: "The duties of the lieutenant governor are prescribed in article VII of the constitution."

Section 1 of Article VII of the Constitution of Montana, supra, in part, provides: "The executive department shall consist of a governor, *lieutenant-governor,* secretary of state, attorney general, state treasurer, state auditor and superintendent of public instruction \* \* \*. The officers of the executive department, *excepting the lieutenant-governor,* shall during their terms of office reside at the seat of government, where they shall keep the public records, books and papers. *They shall perform such duties as are prescribed in this constitution and by the laws of the state.* \* \* \*" Emphasis supplied.

Some of the *powers* of government which the people of Mon-

tana have *expressly* directed or permitted their Lieutenant Governor to exercise are legislative *powers*—some are executive *powers*—some are judicial *powers* while still others are blended *powers* that may, at times be a combination of *powers* of two or even all three of the departments of government.

In the absence of our Constitution there would be no state government and no legislative, no executive and no judicial department. The *power* of each department and the *power* of each officer *comes direct from the people* and it vests where the people's Constitution directs that it shall vest.

■ The *power* which the people of Montana expressly conferred upon their Lieutenant Governor, to give the *casting vote* "when the senate is equally divided" (Sec. 15, Art. VII, Mont. Const.) vests in the Lieutenant Governor alone. At no time does such power vest in any State Senator. Since the Lieutenant Governor is not empowered to vote unless and until "the senate is equally divided," it necessarily follows that, with this *single, specific and express exception,* the right to vote in the Senate is restricted to the duly elected and qualified State Senators, there present and voting. However, "when the senate is equally divided" by reason of a tie vote, it is then and there that the Lieutenant Governor is *expressly empowered, permitted and directed* to step in, take over and cast the deciding vote either for or against the bill, resolution, question or proposition being voted upon. This "casting vote" of the Lieutenant Governor, so expressly provided for, when cast, is to be counted and when counted it becomes and is the efficient parliamentary device that decides and determines the fate of the bill or proposition being voted upon. Such "casting vote" tips the scales and breaks the deadlock and tie of an "equally divided" Senate. It produces "a vote of a majority of all the members" present in the Senate and voting upon the proposition submitted. It specifically meets and fully satisfies the general provisions and requirements of section 24 of Article V of Montana's Constitution.

In adopting subsection 4 of Senate Rule II, the Senate of

Montana's Thirty-seventh Legislative Assembly (1961) acting pursuant to the provisions of Section 11 of Article V and Section 15 of Article VII, of the Constitution of Montana, *expressly* recognized the right and power of the Lieutenant Governor, as President of the Senate, "to decide a tie on any proposition being voted."

In State ex rel. O'Hern v. Loud (1932), 92 Mont. 307, 14 P.2d 432, the facts were: At the regular city election held in Miles City, Montana, in April 1932, a mayor and four aldermen were elected. At the first regular meeting of the council following such election, the newly elected mayor, the four newly elected aldermen and the four hold-over aldermen being present, the mayor nominated C. H. Loud, an attorney at law, for the position of city attorney. Upon roll call of the eight aldermen the vote was four for confirmation of Attorney Loud and four against. The mayor, being of the opinion that he had the right to break the tie, gave a *casting vote* in favor of his nominee, Attorney Loud, said mayor placing his reliance upon the provisions of sections 5031 and 5054, Revised Codes of Montana of 1921 (now R.C.M.1947, §§ 11-803 and 11-1014).

To test the validity of the mayor's right to give his *casting vote,* the relator, Daniel L. O'Hern, an attorney at law, who for some years prior to the aforesaid meeting had occupied the position of city attorney, commenced, in this, the Supreme Court, an original *quo warranto* proceeding to try title to the office of city attorney claiming that it was relator O'Hern's duty to hold over as city attorney and challenging the right of Attorney Loud to hold the office.

Section 5031, Revised Codes of Montana of 1921, provided: "The mayor is the presiding officer of the council, must sign the journals thereof \* \* \* *and decide by his vote all ties, and has no other vote.*" Emphasis supplied.

Section 5054, Revised Codes 1921, provided: "The ayes and noes must be called and recorded on the final passage of any ordinance, by-law, or resolution, or making any contract, *and the*

*voting on the election or appointment of any officer must be viva voce, and a majority of the whole number of the members elected is requisite to appoint or elect an officer,* and such vote must be recorded.'' Emphasis supplied.

The question presented to this court in O'Hern's case, supra, was whether the mayor of Miles City, Montana, had the right to cast the decisive vote on the question of confirming his own appointee as city attorney.

The relator O'Hern urged that under the Codes of this state the powers of cities are distributed into legislative, executive, and judicial powers, the legislative power being vested in the council, the executive power in the mayor and his subordinate officers, and the judicial power in a police court. However, upon comparing the various statutes cited by the relator O'Hern, including Sections 5030, 5031 and 5054, Rev.Codes 1921, supra, this court, speaking through Chief Justice Callaway, held that it was satisfied that ''generally speaking, the corporate authority of a city, existing under the form employed by Miles City, is vested in a mayor and in a board of aldermen (and perhaps other officers) as it was in 1887.''

This court further held in O'Hern's case that ''it may still be said that the mayor is 'a part of the city council.' Strictly speaking, he is not a member of the council in the sense that an alderman is. The mayor is the presiding officer of the council. He has the power, *inter alia,* 'to nominate, and, with the consent of the council, to appoint all non-elective officers of the city or town, provided for by the council, except as provided in this title.' * * * He is a member of the council *sub modo* at least, 'to the extent of the power specially committed to him.' 2 Dillon on Municipal Corporations, § 513.''

So, in the instant case, we say that when Lieutenant Governor Tim M. Babcock, while presiding in the Senate as its president, was confronted with a situation where ''the senate is equally divided'' he immediately became a duly authorized member of the Senate *sub modo* at least ''to the extent of the power

specially committed to him" to cast the deciding vote that produced a majority that broke the deadlock and tie and enabled the side so favored to prevail.

In the O'Hern case, supra, this court in construing sections 5030, 5031 and 5054, Revised Codes of Montana 1921, together, quoted with approval from State ex rel. Young v. Yates, 19 Mont. 239, 47 P. 1004, 37 L.R.A. 205, as follows:

"* * * 'we cannot assent to the proposition that the city council is composed exclusively of the aldermen, and that they may ignore the mayor or deprive him of his right to preside, sit, or vote therein in case of a tie. The relations of the mayor towards the body of the council, the board of aldermen, are controlled by law. He has certain duties, rights, and powers granted to him of an executive nature, yet he presides over and is a constituent part of the whole council exercising its legislative powers, but withal he has no right to vote except where the body over which he presides, the board of aldermen, tie in a vote or proceeding. * * * A nomination to an office which requires confirmation by the members of the council, before becoming effective, necessarily demands a vote of the members constituting the city council who can vote. But, inasmuch as the mayor cannot vote unless there is a tie, the right to vote is necessarily restricted to the aldermen until that condition arises, when, by reason of a tie vote, the mayor may exercise his power, and confirm or reject.' State ex rel. Young v. Yates, supra. Other language in that case is directly applicable to the conditions presented here. We think the decision is as applicable to the present case as to the one for which it was written."

This court concluded its opinion in the O'Hern case, supra, as follows:

"In discussing the question of the power of the mayor to vote as a member of the council when it is expressly provided by statute that he shall be the presiding officer and shall have a deciding vote in the case of a tie, Judge Dillon says: 'When a tie exists the right of the mayor to give a casting vote is not

affected by the fact that the question before the council involves the approval or disapproval of some action on his part as mayor. In case of a tie he may vote, although it be on a motion to confirm an appointment made by him. The mere fact that the appointment is made by him does not deprive him of his vote in the absence of statutory language excluding it.' (Citing authorities.)

"If the words 'a majority of the whole number of the members elected is requisite to appoint or elect an officer' were unrestricted by any other provision, still there is found respectable authority to the effect that, when there is a tie, the mayor may cast the deciding vote. (Citing cases.)

"We come, therefore, to the conclusion that the mayor had the right to break the tie, and Judge Loud is the duly appointed city attorney of Miles City. The proceeding is dismissed."

*Kelley v. Secretary of State.* In drafting his affidavit and application for the writs that issued out of the District Court the relator Easbey relied greatly upon the case of Kelley v. Secretary of State, 149 Mich. 343, 112 N.W. 978, submitted July 13, 1907, and decided July 15, 1907, from which decision Easbey has quoted at great length in his answer brief filed in this court on the instant appeal.

In his answer brief the relator Easbey urges that the Michigan court's opinion in the Kelley case, supra, "is far more persuasive than the decision of the Kentucky court relied upon by appellants" referring thereby to Rouse v. Johnson, 234 Ky. 473, 28 S.W.2d 745, 70 A.L.R. 1077, decided May 27, 1930, wherein the Court of Appeals of Kentucky held that Kentucky's Constitutional Convention provided, in section 83 of the Constitution of that State, "that the Lieutenant Governor, though an executive officer * * * should 'by virtue of his office' be president of the Senate, and gave to him therein mere presiding authority with the coupled right to break a deadlock in case of a tie, and which was essentially and imperatively requisite in order to enable the Senate to function upon the development of

such a contingency; for, unless someone other than a member of the Senate should have the right to break'the deadlock and cast the deciding vote the wheels of legislation, so far as that branch of the General Assembly was concerned, would be locked, and to take care of that possible situation the constitutional convention vested the power in the Lieutenant Governor *by virtue of his office* to unlock the deadlock.''

Careful consideration of the Michigan court's opinion in the Kelley case, supra, and the salient facts of general notoriety connected therewith convinces us of the unsoundness of such opinion.

During the year 1907 each of the following persons was a duly elected qualified and acting officer of the State of Michigan, viz.: Governor Fred M. Warner; Lieutenant Governor Patrick H. Kelley; Attorney General John E. Bird and Secretary of State George A. Prescott.

The Regular Session of the Legislature of the State of Michigan of 1907, commenced on the first Wednesday of January 1907, and it concluded on June 29, 1907, during which period it *passed* 304 bills,—*adopted* 34 Joint Resolutions —*adopted* 2 Concurrent Resolutions and *proposed* 3 Amendments to the Constitution of Michigan of 1850. See certified printed volume entitled: ''Public Acts of the Legislature of the State of Michigan passed at the Regular Session of 1907 [pp. 3-499] containing Joint [pp. 500-525] and Concurrent Resolutions, [pp. 526, 527] Amendments to the Constitution, [pp. 528, 529] and the State Treasurer's Report [pp. 533-548] for the year ending June 30, 1907.''

Concurrent Resolution No. 1 as *adopted* at the Legislature's Regular Session of 1907, appearing at page 526 of the foregoing printed volume, reads:

''[No. 1.]

''CONCURRENT RESOLUTION submitting to a vote of the people of the question of nomination of United States Senator, Governor and Lieutenant Governor by direct vote of the electors.

*"Resolved by the Senate the House of Representatives concurring,* That there shall be submitted to the people of the State of Michigan at the election to be held on the seventeenth day of September, nineteen hundred seven, for choosing delegates to the constitutional convention, the question of nomination by direct vote of the qualified electors of the State, of United States Senator, Governor, Lieutenant Governor, the candidate of any party receiving the highest number of votes of such party for either of said offices to be the candidate of such party for such office, and the Secretary of State is hereby required to certify the same to the clerks of the several counties, and give notice of the same to the sheriffs of the several counties of this State, and the sheriffs of the several counties of this State shall be required to give notice of the same to the several townships and wards in said State, in the manner required by law, and the said question shall be printed upon a separate ballot used at said election, as follows:

" 'For nomination of United States Senator by direct vote of the electors, (   ) Yes.'

" 'For nomination of United States Senator by direct vote of the electors, (   ) No.'

" 'For nomination of Governor by direct vote of the electors, (   ) Yes.'

" 'For nomination of Governor by direct vote of the electors, (   ) No.'

" 'For nomination of Lieutenant Governor by direct vote of the electors, (   ) Yes.'

" 'For nomination of Lieutenant Governor by direct vote of the electors, (   ) No.'

"Such ballots so prepared shall be sent out by the board of election commissioners at the same time as the ballots to be used at said election.

"All votes cast on said question shall be taken, counted, canvassed and returned as provided by law for the election of State officers.''

The House of Representatives duly adopted the above Concurrent Resolution No. 1.

In the Senate, with Lieutenant Governor Patrick H. Kelley in the chair presiding as President of the Senate, and with all of the 32 Senators that had been elected to the Senate, present and voting on the question of the adoption of Concurrent Resolution No. 1, supra, 16 Senators voted for adoption and 16 Senators against it. Thus was Lieutenant Governor Kelley, as President of the Senate, confronted with the problem of how to proceed when there is an equal division, otherwise known as a tie vote, in the Senate.

The one and the only section of the Constitution of Michigan of 1850 that provided the procedure to be followed when there is an equal division in the Senate was Section 14 of Article V thereof which *expressly* and *specifically* provided:

"Sec. 14. The lieutenant governor shall, by virtue of his office, be president of the senate. In committee of the whole he may debate all questions; *and where there is an equal division, he shall give the casting vote.*" Emphasis supplied.

The concluding words *"he shall give the casting vote"* as employed in Section 14 of Article 5, supra, *are words of command.* See Oakland Paving Co. v. Hilton, 69 Cal. 479, at pages 492, 493, 11 P. 3, at p. 9.

Thus, when confronted with *"an equal division"* in the Senate it became and was the duty of Lieutenant Governor Kelley, as President of the Senate, to support and comply with the *express* and *special* provisions of Section 14 of Article 5 of the Constitution,—to obey the command of the people there written and to "give the casting vote" that would decide the fate of Concurrent Resolution No. 1.

At the time the problem was presented to Lieutenant Governor Kelley in 1907 the above *express* and *special* provisions of Section 14 of Article V had been a part of the fundamental law of Michigan continuously for more than seventy years having

originally appeared as Section 15 of Article V of the Constitution of Michigan of 1835.

Lieutenant Governor Kelley cast his lot and his vote with the sixteen State Senators who had voted in the affirmative on the question of the adoption of Concurrent Resolution No. 1 whereupon, he counted the vote which he had just cast, declared Concurrent Resolution No. 1 adopted and, on June 28, 1907, the resolution received the approval of Governor Warner.

Secretary of State Prescott, acting under the advice of Attorney General Bird, declined to take the steps and perform the duties required of him in Concurrent Resolution No. 1 for the submitting to a vote of the people the question of the nomination of Michigan's United States Senators, Governor and Lieutenant Governor by direct vote of the electors.

At this turn of events Lieutenant Governor Kelley, as relator, by his counsel Rollin H. Person, Esq., commenced in the Supreme Court of Michigan an original mandamus proceeding against Secretary of State Prescott, as respondent, seeking a writ to compel the respondent Secretary to perform the acts and duties required of him by Concurrent Resolution No. 1.

The Constitutional question presented was:

Did Lieutenant Governor Kelley, while presiding in the Senate as its President and when there was an equal division therein, have a casting vote on the Concurrent Resolution No. 1?

The following authorities answer "Yes" to the above Constitutional question, viz.:

1. Section 15 of Article V of the First Constitution of Michigan (1835);

2. Section 17 of Article III of the Second Constitution of Kentucky (1799) after which Section 15 of Article V of Michigan's First Constitution (1835) was patterned, speaking of the Lieutenant Governor says: "Sec. 17. He shall, by virtue of his office, be speaker of the senate; have a right, when in committee of the whole, to debate and vote on all subjects; and, when the senate are equally divided, to give the casting vote.";

3. Section 14 of Article 5 of the Constitution of Michigan of 1850;

4. Section XX of the Constitution of New York of 1777;

5. Section 6 of Article 4 of the Constitution of New York in force January 1, 1954;

6. Section 15 of Article VII of the Constitution of Montana;

7. Section 4 of Rule II of the published Rules of the Senate adopted by the Senate of the Thirty-seventh Legislative Assembly of Montana of 1961;

8. Under like circumstances arising in the United States Senate the Vice President would have a casting vote under Section 3 of Article I of the Constitution of the United States which, *inter alia,* provides: "The vice-president of the United States shall be president of the senate, but shall have no vote, unless they be equally divided."

It is quite clear that Lieutenant Governor Kelley by giving his casting vote that enabled the affirmative side to prevail and by instituting and prosecuting his suit against the Secretary of State to compel the latter's obedience to Concurrent Resolution No. 1 and Governor Warner by signing and approving such resolution each answered "Yes" to the above Constitutional question.

On the other hand, Secretary of State Prescott acting upon the advice of Attorney General Bird answered "No" to the Constitutional question as did the eight members, constituting the Supreme Court of Michigan, yet none of these cited or produced the decision or the opinion of any court or the work of any recognized text writer or other precedent that sustains or supports the determination and opinion handed down on July 15, 1907, in the case of Kelley v. Secretary of State, supra.

The one and only section of the Constitution of Michigan of 1850 that pointed out the procedure to be followed under the facts obtaining in the Kelley case, was Section 14 of Article 5 which is an *express* provision *specifically* prescribing what the Lieutenant Governor *shall* do when there is an equal division

in the Senate. It says "he *shall* give the casting vote." This is precisely what Lieutenant Governor Kelley did. He gave the casting vote. He broke the tie. He supported the Constitution. He observed his oath of office. He kept faith with the people. He faithfully discharged the duties of his office to the best of his ability. Sec. 1, Art 18, Michigan Const. of 1850.

At the outset of their opinion in the Kelley case, supra, the members of the Supreme Court announced that the constitutional question there presented "though important, is not difficult to determine. We are therefore able, as the exigency of the case demands, to determine it the second day after its submission." (149 Mich. at p. 345, 112 N.W. at p. 978). Rather a quick off the cuff decision to say the least, but

"If it were done when 'tis done, then 'twere well

"It were done quickly; * * *."

Prior to July 15, 1907, Section 14 of Article 5 of Michigan's Constitution of 1850 read: "The lieutenant governor shall, by virtue of his office, be president of the senate. In committee of the whole he may debate all questions; *and when there is an equal division, he shall give the casting vote.*" Emphasis supplied.

On July 15, 1907, the Supreme Court of Michigan handed down its opinion in the Kelley case, supra, wherein, by strained and unwarranted construction of the provisions of Section 14 of Article 5, supra, the court virtually eliminated and expunged from Section 14, supra, the above italicized thirteen concluding words thereof.

In less than eight months from the day the Supreme Court handed down its decision in the Kelley case the Constitutional Convention of 1907, held at Lansing, after contemplating so much as remained of Section 14 of Article 5 of the Constitution of 1850, proposed as a substitute therefor Section 19 of Article VI of the Constitution of Michigan of 1908, which was subsequently ratified by the people and which reads: "The lieutenant

governor shall be president of the senate, but shall have no vote."

Such is the havoc wrought by the decision in the Kelley case, supra. No longer is the Lieutenant Governor of Michigan authorized to debate questions in the committee of the whole and no longer is he empowered to give the casting vote when there is an equal division in the Senate.

The Michigan court held that the issue before it in July 1907 was "to be determined by that portion of section 19 of Article 4 [of their Constitution] which reads as follows: 'No bill or joint resolution shall become a law without the concurrence of a majority of all the members elected to each house'."

It is quite clear that the Concurrent Resolution No. 1, approved June 28, 1907, which we have quoted in full was neither a bill nor a *joint resolution*. It was not a measure either drafted, designed, proposed or intended for enactment into law. It had no *enacting clause* without which it never could become a law. A motion to strike out the *enacting clause* if carried, kills the bill and a proposed bill that has no *enacting clause* is dead from the start.

Concurrent Resolution No. 1 never was a bill, never was a joint resolution, never contained an enacting clause, never became a law, and regardless of the number of votes cast for its adoption it never could have become a law. Section 19 of Article 4 of Michigan's Constitution, in part reading: "No bill or joint resolution shall become a law without the concurrence of a majority of all the members elected to each house" has no application whatever to Concurrent Resolution No. 1, supra. See: State ex rel. Peyton v. Cunningham, 39 Mont. 197, 103 P. 497; Vaughn & Ragsdale Co. v. State Board of Equalization, 109 Mont. 52, 96 P.2d 420; Becker v. Detroit Savings Bank, 269 Mich. 432, at pp. 434-436, 257 N.W. 853, at p. 854; Collier & C. Lithographing Co. v. Henderson, 18 Colo. 259, 32 P. 417; Scudder v. Smith, 331 Pa. 165, 170, 200 A. 601; McGinley v. Scott, 401 Pa. 310 at pp. 320, 321, 164 A.2d 424, at p. 430.

Rice's Parliamentary Rules gives these definitions:

"Resolution.—A formal motion or resolution in writing offered for adoption by an assembly. It usually begins with the words 'Resolved, That'."

"Joint Resolution.—A formal statement or proposition of less scope than a bill, requiring the concurrence of both branches of a legislative assembly."

Webster's New International Dictionary, 2d ed. Unabridged, gives this definition: "concurrent resolution. *Parliamentary Practice.* Either one of two resolutions identical in language passed independently by both branches of a body. They merely express its assent or opinion. cf. joint resolution."

■ In Kalamazoo Municipal Utilities Association v. City of Kalamazoo, 345 Mich. 318, at p. 328, 76 N.W.2d 1, at pp. 5, 6, 61 A.L.R.2d 583, at pp. 591, 592, the court said: "A resolution is not a law or an ordinance but merely the form in which a legislative body expresses a determination or directs a particular action. An ordinance prescribes a permanent rule for conduct of government, while a resolution is of special or temporary character."

The Supreme Court of Montana is not about to eliminate or expunge any word or words from Section 15 of Article VII of Montana's Constitution, nor is it about to allow the *general* provisions of Section 24 of Article V of our Constitution to supplant or override the *express and specific* provisions of Section 15 of Article VII, supra, which here control.

■ Lieutenant Governor Babcock was duly and *expressly* authorized by Section 15 of Article VII of Montana's Constitution and by Section 4 of Senate Rule II to cast the deciding vote on House Bill 342 and it became and is a valid law.

This opinion is confined to a consideration and determination of the constitutional question presented and it neither considers nor passes upon the necessity for nor the wisdom or merits of such legislation as Chapter 249 of the Montana Session Laws of 1961.

In our opinion the "Affidavit and Application for Alternative Writ of Prohibition" which the relator Easbey made and filed in the trial court in this cause fails to state facts sufficient to constitute a cause of action against any of the appellants herein or sufficient to warrant the granting of any relief whatever therein. It follows that it was prejudicial error for the trial court: To deny appellants' timely motion to quash the writs issued against and served upon them; to make and cause to be entered in this cause the trial court's judgment and order of July 27, 1961, and to direct the issuance against appellants of the writs of prohibition herein.

Accordingly it is ordered and adjudged: That the writs of prohibition, both alternative and peremptory, issued against the appellants herein be vacated and set aside; that the judgment and order made, given and entered in the trial court against the appellants herein on or about July 27, 1961, be reversed, vacated and set aside and that the appellants herein have and recover of and from the relator Fremont H. Easbey appellants' proper and lawful costs herein.

MR. JUSTICES DOYLE and JOHN C. HARRISON concur.

MR. JUSTICE CASTLES:

I concur in the result but not in all that is said.

MR. CHIEF JUSTICE HARRISON:

I concur in the result.