CENTER BANK, A STATE BANKING CORPORATION, ET AL., PLAINTIFFS, V. DEPARTMENT OF BANKING AND FINANCE OF THE STATE OF NEBRASKA ET AL., DEFENDANTS.

313 N.W.2d 661

Filed December 18, 1981. No. 44421.

Barlow, Johnson, DeMars & Flodman and Ryan & Williams, P.C., for plaintiffs.

Paul L. Douglas, Attorney General, and John Boehm

for defendants.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and HASTINGS, JJ., and RONIN, Retired District Judge.

BOSLAUGH, J.

This is an original action brought to determine whether L.B. 376 was duly enacted by the First Session of the Eighty-seventh Legislature. The bill in question relates to banking and, among other provisions, authorizes banks to establish and maintain additional "detached auxiliary offices" at which banking transactions may be made.

The plaintiffs made application to the Department to establish detached auxiliary offices as authorized by L.B. 376. Upon the advice of the Attorney General that L.B. 376 was not effective, the Department refused to act upon the applications. The plaintiffs then commenced this action against the Department and its director to determine whether L.B. 376 was effective.

The essential facts are admitted by the pleadings. The case presents only questions of law.

On May 28, 1981, L.B. 376 was on final reading in the Legislature. All 49 senators and the Lieutenant Governor were present. On the question, "Shall the bill pass?" 24 senators voted in the affirmative, 24 senators voted in the negative, and one senator abstained. The Lieutenant Governor, as president of the Legislature, then declared the Legislature equally divided, voted in the affirmative, and declared the bill passed. The first issue to be determined is whether the Lieutenant Governor, as president of the Legislature, was entitled to vote on the bill on final reading.

There are two constitutional provisions which must be considered. Article III, § 13, of the Nebraska Constitution provides in part: "No bill shall be passed by the Legislature unless by the assent of a majority of all members elected . . . ." Article III, § 10, of the Nebraska Constitution provides in part: "The Lieutenant

Governor shall preside, but shall vote only when the Legislature is equally divided." The plaintiffs contend that the Lieutenant Governor was entitled to vote on final reading and that L.B. 376 was duly passed. The defendants contend that L.B. 376 failed to receive "the assent of a majority of all members elected" and, thus, failed to pass.

The parties have cited decisions in other states which have arrived at different conclusions under similar constitutional provisions. We consider none of these authorities to be controlling.

The language of article III, § 13, is so clear that we believe there can be little doubt about its meaning. That provision requires "the assent of a majority of all members elected" to the Legislature. The Lieutenant Governor is not a member of the Legislature. Since the Legislature consists of 49 members, a bill must receive the affirmative vote of 25 senators on final reading before it can become law. Because L.B. 376 received the affirmative vote of only 24 senators on final reading, it failed of passage and did not become law.

This interpretation does not destroy the meaning of article III, § 10, but harmonizes the two provisions and gives effect to both. The Lieutenant Governor is eligible to vote on all other questions before the Legislature, when it is equally divided.

This interpretation also finds support in some of the earlier decisions of this court on somewhat related questions.

In *State v. Gray*, 23 Neb. 365, 36 N.W. 577 (1888), two members of a four-member city council voted "aye," two members abstained, the mayor voted "aye" and declared the motion passed. The statute required "a concurrence of a majority of the whole number of members elected to the council," and further provided, "The mayor . . . shall have a casting vote when the council is equally divided, and none other . . . ." This court stated at 369, 36 N.W. at 578-79: "Considering these sections together, there can be no doubt that to

pass an ordinance for the reorganization of the city by increasing the number of wards, and of the membership of the council, it required the concurring vote of a majority of all the councilmen elected, and the vote of two members of a council consisting of four members was not sufficient, and that the vote of the mayor added nothing to the significance of the proceeding."

In *Rohrer v. Hastings Brewing Co.*, 83 Neb. 111, 119 N.W. 27 (1908), the applicable statutes gave the mayor "a casting vote when the council is equally divided," and further required "a concurrence of a majority of the whole number of the members elected to the council" to pass an ordinance. We held at 114, 119 N.W. at 28: "As to every other act of the council, except the passage of ordinances, the mayor may vote in case of a tie vote of the councilmen."

The parties have briefed and argued another question which should be decided because of its importance in regard to the legislative process.

After L.B. 376 had been declared passed, the Lieutenant Governor signed the bill while the Legislature was still in session. L.B. 376 was then presented to Governor Thone. On May 29, 1981, an aide to the Governor brought the engrossed copy of L.B. 376 to the Clerk of the Legislature, together with a letter from the Governor. In the letter the Governor stated that he was not vetoing the bill, but simply returning it based upon an Attorney General's opinion that the bill had not been passed by the Legislature since only 24 senators had voted in the affirmative the previous day. The Clerk attempted to refuse delivery of the engrossed copy of the bill, but it was left on the receptionist's desk outside the Clerk's office.

When the Governor's letter was read to the Legislature on May 29, 1981, one senator moved that the Legislature reconsider the bill. Another senator raised a point of order to the effect that the motion to override was out of order since the bill had not been vetoed. The Chair declared the motion to override out of order, and a

motion to overrule the Chair was defeated. The bill was not again reconsidered by the Legislature.

The letter which the Governor sent to the Legislature on May 29, 1981, stated in pertinent part: "I have on my desk LB 376. On the advice of the Attorney General, with which I most certainly agree, it appears that LB 376 has not been <u>passed</u> by the Legislature.

. . . .

"The Legislature's Journal clearly indicates that LB 376 received only 24 votes from elected members of the Legislature. Twenty-five votes are needed for a Constitutional majority. Therefore, this bill did not meet the Constitutional requirement and was not <u>passed</u> by the Legislature.

"The return of LB 376 to the Clerk of the Legislature is a clerical function and is not, and should not be construed as, an exercise of the Governor's authority under Article IV, Sec. 15 of the Constitution of the State of Nebraska. In other words, I am not by this action exercising my Constitutional authority to veto this purported piece of legislation which was never legally passed by the Legislature."

The Constitution limits the action the Governor may take when the Legislature presents a bill to him for his consideration. "Every bill passed by the Legislature, before it becomes a law, shall be presented to the Governor. If he approves he shall sign it, and thereupon it shall become a law, but if he does not approve . . . he shall return it with his objections to the Legislature . . . . Any bill which shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, shall become a law in like manner as if he had signed it; unless the Legislature by their adjournment prevent its return; in which case it shall be filed, with his objections, in the office of the Secretary of State within five days after such adjournment, or become a law." Neb. Const. art. IV, § 15.

In the present case the Governor did not sign the

bill. He returned the bill within 5 days with a message stating his objections.

The Nebraska Constitution does not give the Governor the power to return a bill to the Legislature as a "clerical function." The Constitution clearly provides that if the Governor returns the bill to the Legislature with his objections, the bill shall be reconsidered and become a law if it is repassed by a vote of three-fifths of the members elected.

The Governor's letter stated his objections to the bill. The fact that the objections did not go to substantive provisions of the bill was of no consequence. See *Birdsall v. Carrick*, 3 Nev. 154 (1867).

In this case, the return of L.B. 376 to the Legislature by the Governor with his objections would have prevented the bill from becoming law unless it was reconsidered by the Legislature and passed as provided in the Constitution.

It is unnecessary to consider any of the other questions raised by the parties.

For the reasons stated in this opinion, the judgment is in favor of the defendants.

JUDGMENT FOR THE DEFENDANTS.

KRIVOSHA, C.J., concurring in the result, and in part dissenting.

I find that while I concur with the result reached by the majority of the court in this case, I must in part dissent.

In particular, I agree with the majority of the court when it concludes that when the Governor returned to the Legislature L.B. 376, together with his letter setting out the reason why he would not sign the bill into law, the Legislature was required to reconsider the bill if it was to become law. For that reason, I agree with the majority's opinion that judgment must be in favor of the defendants in this case.

I do not, however, agree with the conclusion reached by the majority of the court to the effect that the

Lieutenant Governor is not eligible to vote for legislative bills on final reading. In my view this conclusion totally ignores the plain meaning of Neb. Const. art. III, § 10. I believe that the majority has reached the wrong conclusion because it has misinterpreted the meaning of Neb. Const. art. III, § 13, which provides in part: "No bill shall be passed by the Legislature unless by the assent of *a majority of all members elected* . . . ." (Emphasis supplied.) The majority concludes that only members of the Legislature may cast a vote in connection with a legislative bill on final reading. I believe that such a narrow reading of the Constitution is unnecessary.

In my opinion, the provisions of article III, § 13, are intended only to aid in determining how the necessary majority is to be computed. Under the provisions of Neb. Const. art. III, § 6, the Legislature shall consist of not more than 50 members and not less than 30 members. The exact number may vary from time to time. Furthermore, article III, § 10, provides in part: "A majority of the members elected to the Legislature shall constitute a quorum . . . ." Article III, § 13, is simply intended to prescribe the formula to be used in computing the number of votes required to effect passage of a legislative bill on final reading. Article III, § 13, provides, in effect, that when the Legislature consists of 49 members, 25 votes are required in order for a bill to pass on final reading. The language of article III, § 13, was necessary, otherwise one might argue that the majority necessary to pass a bill on final reading meant "the majority of those present and voting," in this case 13 votes, as opposed to a majority of those constituting the legislative branch of government, whether present or not.

This is, to some extent, made clear by our decision in *In re Contest Proceedings*, 31 Neb. 262, 273, 47 N.W. 923, 926 (1891), where we said in part: "It was in obedience to this change of sentiment that our constitution finally provided that all bills and joint resolu-

tions should be read on three separate days in each house respectively, and also provided that all bills should pass by a majority—not of a quorum—which had once been the universal rule, but by a majority of all the members elected to each house, and that the votes should be taken by ayes and noes, and entered upon the journal."

It occurs to me that any other interpretation has the effect of repealing article III, § 10, which provides: "The Lieutenant Governor shall preside but *shall* vote only when the Legislature is equally divided." (Emphasis supplied.)

The framers of the Constitution had already provided that a majority of the members elected constituted a quorum, and therefore they wished to make it clear that it required more than just a simple majority present and voting to pass a bill.

It is suggested by the majority opinion that the provisions of article III, § 10, are not repealed because the Lieutenant Governor may vote on anything other than a bill on final reading. However, the reading of article III, § 13, makes no provision for anything other than final reading. The fact that the Legislature has determined by rule to have more than one reading of a bill is a matter of internal procedural rules and not a matter of constitutional requirement. Should the Legislature determine in the future to eliminate all of those procedures and simply follow the mandates of Neb. Const. art. III, § 14, no constitutional violation would occur, and yet, under that basis, the Lieutenant Governor would have no vote in any instance. It is difficult to conceive why the Constitution would authorize preliminary matters to be passed by a simple majority of the Legislature and authorize the Lieutenant Governor to vote to break a tie in such cases and at the same time require a majority of members elected to the Legislature to pass a bill on final reading and take away the Lieutenant Governor's authority to break such a tie without specifically

saying so. I cannot believe that is what the framers of the Constitution intended.

A number of states which have been presented with similar questions have resolved the issue in the same manner as suggested by this dissent. See, *State ex rel. Easbey v. Highway Patrol Bd.*, 140 Mont. 383, 372 P.2d 930 (1962); *Opinion of the Justices*, 225 A.2d 481 (Del. 1966); *Advisory Opinion on 1978 PA 426*, 403 Mich. 631, 272 N.W.2d 495 (1978).

In *State ex rel. Easbey*, a bill presented to the Montana Senate resulted in a final reading vote of 27 senators in favor and 27 senators opposed, with two senators excused. The Lieutenant Governor, who was then presiding over the Senate, broke the tie by voting in favor of the bill. The applicable provisions of the Montana Constitution were identical with the Nebraska Constitution. Finding that the Lieutenant Governor did have authority to vote, the Montana Supreme Court said at 391, 372 P.2d at 935: "The people of Montana have specifically supplied the answer to the above question in their Constitution wherein they have 'expressly directed or permitted' and conferred various special powers on the Lieutenant Governor, not the least of which, is the power, right and high privilege of presiding over the sessions and meetings of the State Senate as its President with the express direction that, while so presiding, he 'shall vote only when the senate is equally divided.'" (Emphasis omitted.)

The Montana court went on further to say at 399, 372 P.2d at 939: "The power which the people of Montana expressly conferred upon their Lieutenant Governor, to give the casting vote 'when the senate is equally divided,' [citation omitted] vests in the Lieutenant Governor alone. At no time does such power vest in any State Senator. Since the Lieutenant Governor is not empowered to vote unless and until 'the senate is equally divided,' it necessarily follows that, with this single, specific and express exception,

the right to vote in the Senate is restricted to the duly elected and qualified State Senators, there present and voting. However, 'when the senate is equally divided' by reason of a tie vote, it is then and there that the Lieutenant Governor, is expressly empowered, permitted and directed to step in, take over and cast the deciding vote either for or against the bill, resolution, question or proposition being voted upon. This 'casting vote' of the Lieutenant Governor, so expressly provided for, when cast, is to be counted and when counted it becomes and is the efficient parliamentary device that decides and determines the fate of the bill or proposition being voted upon. Such 'casting vote' tips the scales and breaks the deadlock and tie of an 'equally divided' Senate. It produces 'a vote of a majority of all the members' present in the Senate and voting upon the proposition submitted. It specifically meets and fully satisfies the general provisions and requirements of section 24 of Article V of Montana's Constitution." (Emphasis omitted.)

And in *Opinion of the Justices, supra,* the Delaware court, in deciding an identical question as that presented here, said at 484-85: "The applicable rules of construction require that effect be given, if possible, to the whole Constitution and to every word thereof. If different portions of the Constitution seem to conflict, they must be harmonized if possible. That construction must be favored which will render every word of the instrument operative; and that construction must be avoided which would make any provision idle and nugatory. Every provision of the Constitution must be construed, whenever possible, to give effect to every other provision. Otherwise stated, whenever avoidable, no constitutional provision should be so construed as to nullify, or substantially impair, any other constitutional provision or to produce an irrational result. . . .

. . . .

"It is unreasonable to assume, we think, that the

framers of the Constitution intended to limit the casting vote, vested in the Lieutenant Governor by Art. 3, § 19, to those less important functions and decisions which were left by the Constitution to a majority of a quorum of the Senate. It is more reasonable to assume, in our opinion, that the casting vote of Lieutenant Governor was intended to break ties in the more important matters before the Senate, as well as the less important ones. It is in the public interest that there be a proper method to break deadlocks and to avoid impasse in the Senate. This was the rationale for vesting in the Vice President the casting vote in the United States Senate: 'to secure at all times the possibility of a definitive resolution of the body.' The Federalist Papers, No. 68: Hamilton. The more important the matter pending for decision, the more essential such tie-breaking device is to the public welfare."

The Michigan Supreme Court reached a similar conclusion in analyzing a somewhat identical constitutional provision in the case of *Advisory Opinion on 1978 PA 426, supra.*

I believe that by taking the position which we have taken today, we have effectively eliminated the office of Lieutenant Governor as the president of the Legislature and have, in effect, repealed article III, § 10. I see no reason for us to do so, and I would have held that the Lieutenant Governor does indeed have the right to cast a tie-breaking vote on final reading.

CLINTON and BRODKEY, JJ., join in this concurrence and dissent.