STATE of North Dakota ex rel. Wayne
G. SANSTEAD, Relator and Petitioner,

v.

Senator Howard A. FREED, President
Pro Tem of the North Dakota
Senate, et al., Respondents.

Civ. No. 9308.

Supreme Court of North Dakota.

Feb. 21, 1977.

Lee W. Fraase and Charles Tighe, Bismarck, for petitioner. Also present, Senior Law Student Paul Fraase.

Senator Howard A. Freed, President Pro Tempore, and Senator David E. Nething, Majority Floor Leader, of the North Dakota Senate, for respondents. Also present, Senior Law Student Carl Flagstad.

PAULSON, Judge.

The instant proceeding is a Petition for Original Prerogative Writ under § 86 of the North Dakota Constitution, seeking an order from this Court prohibiting the North Dakota Senate of the 45th Legislative Assembly from conducting its affairs and proceedings under Senate Rules 26 and 55 as the same presently exist and requiring the North Dakota Senate to amend Senate Rules 26 and 55 "consistent with the decision of this Court". This Court issued an Order for Hearing on January 12, 1977, in which we requested that the parties address the question of this Court's jurisdiction as well as the merits of the petition. The matter was heard on January 28, 1977.

The Petitioner, Lieutenant Governor Wayne G. Sanstead, instituted the instant proceeding in response to action taken by

the North Dakota Senate on December 9, 1976, on the third day of the Senate's organizational and orientation session wherein Senate Rules 26 and 55 were amended.

Before amendment, Senate Rule 26 read:

"26. VOTE BY PRESIDENT

"The President shall vote only in case of a tie (See Rule 55)." [Senate and House Rules and Committees of the 44th Legislative Assembly of N.D., p. 13–S.R. (1975).]

Senate Rule 26 was amended to read:

"26. VOTE BY PRESIDENT

"The President shall vote only in case of a tie with respect to a procedural question. The President shall not vote on final disposition of any measure (See Rule 55)." [Senate and House Rules and Committees of the 45th Legislative Assembly of N.D., p. 14–S.R. (1977).]

Before amendment, Senate Rule 55 read:

"55. FINAL PASSAGE

"No bill shall become a law except by a vote of the majority of the members-elect of each House, nor unless on its final passage, the vote be taken by ayes and nays and the names of those voting be entered in the journal; provided, however, that no measure enacted or approved by a vote of the electors shall be repealed or amended by the legislature, except by a two-thirds vote upon roll call of all members elected to each House. Ratification of amendments to the Constitution of the United States shall be by concurrent resolution approved by a majority, upon roll call vote, of the members elected to each House." [Senate and House Rules and Committees, 44th Legislative Assembly of N.D., p. 27–S.R. (1975).]

Senate Rule 55 was amended to read:

"55. FINAL PASSAGE

"No bill shall become a law except by a vote of the majority of the senators-elect and of the members-elect of the House of Representatives, nor unless on its final passage, the vote taken by ayes and nays and the names of those voting be entered in the journal; provided, however, that no measure enacted or approved by a vote of the electors shall be repealed or amended by the legislature, except by a two-thirds vote upon roll call of all members elected to each House. Ratification of amendments to the Constitution of the United States shall be by concurrent resolution approved by a majority, upon roll call vote, of the members elected to each House." [Senate and House Rules and Committees, 45th Legislative Assembly of N.D., p. 29–S.R. (1977).]

Lieutenant Governor Sanstead contends that the amendments to the Rules of the North Dakota Senate of the 45th Legislative Assembly violate and contravene § 77 of the North Dakota Constitution, which provides, in pertinent part:

"Section 77. The powers and duties of the lieutenant governor shall be to serve as president of the Senate, but he shall have no vote unless they be equally divided. . . ."

In answering for the Senate, State Senator Howard A. Freed, President Pro Tempore of the North Dakota Senate, and State Senator David E. Nething, Majority Floor Leader of the North Dakota Senate, contend that Senate Rules 26 and 55 of the 45th Legislative Assembly, as amended, are not only constitutional, but are mandated by § 65 of the North Dakota Constitution, which provides:

"Section 65. No bill shall become a law except by a vote of a majority of all the members-elect in each house, nor unless, on its final passage, the vote be taken by yeas and nays, and the names of those voting be entered on the journal."

## I. JURISDICTION

Lieutenant Governor Sanstead asks that this Court exercise its original jurisdiction under § 86 of the North Dakota Constitution and issue an Original Prerogative Writ. Only the apparent conflict between Senate Rules 26 and 55, as amended, and § 77 of the North Dakota Constitution is alleged—

since the amendment of Senate Rules 26 and 55 there had been no tie vote in the North Dakota Senate on any measure where the Lieutenant Governor had attempted to cast a tie-breaking vote; nor had there been such a tie vote when, in compliance with the said amended Rules, the Lieutenant Governor had abstained from voting as of the time of oral arguments before this Court.

 This Court has long held that proceedings before this Court must involve an actual controversy of a justiciable character, between parties having adverse interests, and that we may not decide abstract legal questions or render purely advisory opinions. Section 94, N.D.Const.; *State ex rel. Olsness v. McCarthy*, 53 N.D. 609, 207 N.W. 436, 437 (1926); *Langer v. State*, 69 N.D. 129, 284 N.W. 238, 251 (1939); and *State ex rel. Johnson v. Baker*, 74 N.D. 244, 21 N.W.2d 355, 358 (1945). In *State ex rel. Olsness v. McCarthy, supra* 207 N.W. at 437, this Court said:

> "The question is merely an abstract one, and arises solely because there is a disagreement between two officers as to what rule of law shall apply when an actual transaction does arise. As we view the case, this court is asked to deliver an advisory opinion. This we may not do. The courts of this state are authorized only to determine questions of law as they arise in actual controversies, and may not properly decide abstract legal questions or render purely advisory opinions."

In *Langer, supra* 284 N.W. at 250, this Court, quoting Judge Cardozo in *Self-Insurers' Association et al. v. State Industrial Commission (In re Workmen's Comp. Fund)*, 224 N.Y. 13, 16, 119 N.E. 1027, 1028 (1918), stated:

> " 'The function of the courts is to determine controversies between litigants. [Citation of authorities.] They do not give advisory opinions. The giving of

such opinions is not the exercise of the judicial function. * * * In the United States no such duty attaches to the judicial office in the absence of express provision of the Constitution. * * * In this state the Legislature is without power to charge the courts with the performance of nonjudicial duties.' "

As was pointed out during the North Dakota Constitutional Debates of 1889, at which Convention a proposed "advisory opinion" clause for our Constitution was considered and rejected:

> ". . . we will have in this State an officer designated as the Attorney General, whose peculiar business it will be to advise the State officers and the Legislature when called upon. . . . the Attorney General is the officer to advise the civil officers, and when questions come before the Supreme Court, that court is then untrammeled." Proceedings and Debates of the First Constitutional Convention of North Dakota (1889), pp. 230–231.

Thus, before this Court can find jurisdiction, we must determine that we would be performing more than an advisory function as was carried out by the Attorney General on February 19, 1945, and by the Attorney General on February 18, 1975, in their opinions on this subject.

 We find the facts of the instant proceeding do constitute a justiciable controversy. The Lieutenant Governor instituted the present proceedings to challenge the restraint placed by the State Senate of the 45th Legislative Assembly upon his office as President of the Senate. Such controversy needs no further factual development for our analysis. There is a present and existing conflict between the Attorney General's opinion of February 18, 1975, that a lieutenant governor may cast the deciding vote on the final passage of a bill in the Senate[1] and the present Senate Rules 26 and 55, which were amended during the December 1976 organizational session of the

---

1. The Attorney General's opinion of February 18, 1975, reversed an earlier Attorney General's

opinion on the same question issued February 19, 1945.

45th Legislative Assembly by the Senate and adopted, as amended, which Rules prohibit the Lieutenant Governor from voting except on procedural matters. The question is no longer abstract and becomes one of reality with the adoption of the amended Senate Rules 26 and 55.[2] To require that the Lieutenant Governor actually attempt to cast a tie-breaking vote on the final passage of a bill in open and direct defiance of such Senate Rules would be absurd— such action could conceivably result in the removal of the Lieutenant Governor from the Chair in the Senate and in forcing the State Senate to hold the Lieutenant Governor in contempt of the State Senate—thus creating in the upper House of our Legislature the chaos and confusion our system of government is designed to prevent.

We find the instant proceeding appropriate for the exercise of this Court's original jurisdiction pursuant to § 86 of the Constitution of the State of North Dakota. Section 86 grants this Court authority to issue writs, in the exercise of its prerogative jurisdiction over questions involving the sovereignty of the State, its prerogatives, or the liberties of its people. *State ex rel. Moore v. Archibald*, 5 N.D. 359, 66 N.W. 234 (1896); *State ex rel. DeKrey v. Peterson*, 174 N.W.2d 95, 98 (N.D.1970), and cases cited. We find that the exceptional circumstances surrounding the instant proceeding directly affect not only the elected officials, but also the integrity of the law-making process of our Legislature. We make such finding based on the following factors: (1) the Lieutenant Governor openly declared his intent to cast a tie-breaking vote if the members of the State Senate are equally divided on the final consideration on a bill; (2) members of the State Senate have openly declared an intent to challenge any attempt by the Lieutenant Governor to vote on the final consideration on a bill; (3) the 45th Legislative Assembly is currently in session; (4) the legal status of any bill passed by the State Senate with a tie-breaking vote cast by the Lieutenant Governor would be in doubt; and (5) it is in the best interests of the State of North Dakota that a direct confrontation between the Lieutenant Governor and the State Senate be avoided, so as to assure an orderly law-making process during the term of the 45th Legislative Assembly.

Because § 48 of the Constitution of the State of North Dakota provides:
> *Section 48.* Each house shall have the power to determine the rules of proceedings and punish its members or other persons for contempt or disorderly behavior in its presence . . .",

it might be argued that this Court's assumption of jurisdiction would produce a potentially embarrassing confrontation between equal and coordinate branches of our state government. We disagree. Rules governing proceedings in the State Senate must not violate or contravene the provisions of the Constitution of the State of North Dakota. It is the responsibility of this Court to act as the ultimate interpreter of the Constitution of the State of North Dakota. The United States Supreme Court, nearly one hundred years ago, in *Kilbourn v. Thompson*, 103 U.S. 168, 199, 26 L.Ed. 377 (1881), quoted with approval from the case of *Burnham v. Morrissey*, 14 Gray 226, 80 Mass.Rep. 226 (1859):
> "Especially is it competent and proper for this court to consider whether its proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases

**2.** This Court notes that since the time we took the instant proceeding under advisement, the State Senate has had a tie vote on the final passage of a bill and the Lieutenant Governor attempted to cast a tie-breaking vote. The members of the State Senate challenged the ruling of the Chair, which ruling was overridden by a vote by 32–18, thus prohibiting the Lieutenant Governor from casting such vote. We also noted a second tie vote in the Senate in which the Lieutenant Governor cast a tie-breaking vote, which tie-breaking vote was unsuccessfully challenged by the members of the State Senate. (1977 S.J. pp. 547, 607.)

regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void."

Our consideration of State Senate Rules 26 and 55 requires only that the Constitution of the State of North Dakota be interpreted, in the instant case. This determination falls squarely within the traditional role accorded this Court. Even a question of whether a matter has, in any manner, been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed to it, is itself a delicate exercise in constitutional interpretation and is a responsibility of this Court as ultimate interpreter of the Constitution of the State of North Dakota. *Verry v. Trenbeath*, 148 N.W.2d 567, 570 (N.D.1967); see *Powell v. McCormack*, 395 U.S. 486, 514–521, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

## II. CONSTITUTIONAL INTERPRETATION

The ultimate question for our decision herein is whether Senate Rule 26 of the State Senate of the 45th Legislative Assembly which allows the Lieutenant Governor to cast a tie-breaking vote in the State Senate only in cases of a tie vote with respect to a procedural question—and prohibits his tie-breaking vote on the "final disposition of any measure"—is constitutional. The answer to that question depends on whether § 65 of our State Constitution, which provides that "No bill shall become a law except by a vote of a majority of all the members-elect in each house . . ." denies the Lieutenant Governor a tie-breaking vote on the final disposition of any measure; or whether § 77 of our

State Constitution, which authorizes the Lieutenant Governor to vote in the State Senate when "they be equally divided" confers on the Lieutenant Governor the right to cast a tie-breaking vote on the final disposition of a bill. We hold, for the reasons herein discussed, that Senate Rule 26, as it applies to the final disposition of a "bill" is constitutional—but that such Senate Rule 26 is unconstitutional as it relates to a tie-breaking vote by the Lieutenant Governor on the final disposition of other "measures".

Our examination of the constitutional provisions of other jurisdictions is of little help. We find that there are currently twenty-two States with some degree of conflict between their constitutional provisions giving a lieutenant governor a tie-breaking vote as the presiding officer of the senate, and their provisions requiring that a specific majority of the "members-elect" of the senate be necessary for the passage of a bill, constitutional amendment, joint resolution, or a monetary appropriation. Of such States, nine States employ language very similar to §§ 65 and 77 of our Constitution. Unfortunately, only four States have judicially resolved the issue presented herein, and, of these, there is an even split as to how one should reconcile the differences between §§ 65 and 77 of our Constitution. *Opinion of Justices*, 225 A.2d 481 (Del.1966); *State ex rel. Easbey v. Highway Patrol Board*, 140 Mont. 383, 372 P.2d 930 (1962); *Coleman et al. v. Miller*, 146 Kan. 390, 71 P.2d 518 (1937); and *Kelley v. Secretary of State*, 149 Mich. 343, 112 N.W. 978 (1907).[3] All four of these cases applied the same rules of constitutional construction as were applied by our own Attorney General in his opinion issued on this subject on February 19, 1945, to the effect that our Lieutenant Governor did not have a tie-breaking vote on the final disposition of a bill in the Senate. It is because we do not wish to rely solely upon an abstract legal argument

---

**3.** In addition, we note three cases which indirectly address the issue presented herein—*State ex inf. Danforth v. Cason*, 507 S.W.2d 405 (Mo.En. Banc 1973); *Opinion of Justices*, 284 Ala. 129, 222 So.2d 714 (1969); and *Rouse et al. v. Johnson*, 234 Ky. 473, 28 S.W.2d 745, 70 A.L.R. 1077 (1930).

over the application of legal doctrines of constitutional construction—that completely ignore our own historical development—we choose not to base our decision on an alignment with the Montana-Delaware cases or the Michigan-Kansas cases, but, rather, choose to rely on the wisdom of our citizens' contemporaneous interpretation of our Constitution's provisions beginning with the adoption of our Constitution and continuing for more than eighty-five years.

 This Court has long recognized that in the construction of constitutional provisions, it should undertake to ascribe to the words used the meaning which the people understood them to have when the constitutional provision was adopted. This was expressed in *State ex rel. Linde v. Robinson et al.*, 35 N.D. 417, 421–422, 160 N.W. 514, 516–517 (1916), wherein this Court undertook to interpret the meaning of the constitutional provisions which provided for the commencement of the term of office of judges elected to the State Supreme Court. In deciding that question, this Court quoted from a recognized text on constitutional interpretation which emphasized reliance on contemporaneous and practical constitutional constructions that have been acquiesced in for a considerable period of time.

"Before taking up a discussion of the several sections of the Constitution, it may be appropriate to refer to certain canons of construction which are so thoroughly settled as a part of the law of the land that their simple statement will be sufficient to show the elementary character they possess. 'The object of construction, as applied to a written Constitution, is to give effect to the intent of the people in adopting it. . . .' And finally, as an elementary rule of construction, we note that which is drawn from contemporaneous and practical constructions, and 'where there has been a practical construction which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction sometimes present themselves to the courts with a plausibility

and force which it is not easy to resist.' " [The above quotations in our Court's opinion are taken from Cooley's Constitutional Limitations (7th Ed.) c. 4, beginning at page 70 and ending at page 123 thereof.]

On several occasions this Court has relied on contemporaneous interpretations of ambiguous provisions of our Constitution. *State ex rel. Rausch v. Amerada Petroleum Corp.*, 78 N.D. 247, 49 N.W.2d 14, 21 (1951); *State ex rel. Linde v. Hall*, 35 N.D. 34, 159 N.W. 281, 285–286 (1916); *State ex rel. Linde v. Packard*, 35 N.D. 298, 160 N.W. 150 (1916); *O'Laughlin v. Carlson*, 30 N.D. 213, 152 N.W. 675, 677 (1915); *Barry v. Truax*, 13 N.D. 139, 99 N.W. 769, 771 (1904). We find the constitutional provisions at issue in the present proceeding to be best interpreted with the application of contemporaneous interpretation. Neither contemporaneous nor long-continued legislative practice should be disregarded in determining the functions of the Lieutenant Governor as President of the Senate where there has been long acquiescence by the people in such construction. *State ex rel. Linde v. Hall, supra*; 16 C.J.S. Constitutional Law § 34, pp. 112–114.

The history of §§ 65 and 77 of our Constitution dates back to North Dakota's First Constitutional Convention in 1889. Both sections were amended by the 1889 Constitutional Convention from the form of their original proposal to their present form, but no comments were recorded in the Debates of such Constitutional Convention which would aid this Court's reconciliation of their apparent inconsistency. Both sections were adopted at the same time by a vote of the electorate of the State of North Dakota in 1889. Neither section has since been amended so as to alter its meaning pertinent to the issues presented in this proceeding.

Because we find no interpretive guide on this subject in the written record of the Debates of the First Constitutional Convention (1889), we will examine the history of the legislative application of §§ 65 and 77

of our Constitution as these sections relate to the issue herein. We will first examine the historical development of the Senate Rules and then the application of those Rules by reviewing the Senate Journal of each Legislative Assembly since Statehood, to determine what actually occurred whenever there was a tie vote on the final consideration of a bill in the State Senate.

Our examination of the Senate Rules reveals that, prior to 1945, no Senate Rule existed relating to the tie-breaking power of the Lieutenant Governor which corresponded to present Senate Rule 26. Apparently, in 1945, when a tie vote did occur on the final consideration of a bill in the Senate, the then Attorney General was asked for his opinion on whether the Lieutenant Governor was authorized under the existing Senate Rules to cast a tie-breaking vote. The Attorney General answered such inquiry in the negative, basing his February 19, 1945, opinion on rules of constitutional construction—to the effect that the requirement of § 65 of the Constitution that all bills must receive a majority vote of the "members-elect" in each House before they become law was mandatory language and was more specific than the language of § 77 of the Constitution—thus he concluded that § 65 of the Constitution was controlling. We note that the February 19, 1945 opinion of the Attorney General was issued at a time when the only two appellate court decisions (in Michigan and in Kansas) on this issue had reached the same conclusion. We also note that the Attorney General's Opinion of February 19, 1945, was consistent with the long-standing practice of our State Senate as recorded in its journals.

Subsequent to the issuance of the February 19, 1945 opinion by the Attorney General, the State Senate, in 1947, amended its Rules to include Senate Rule 26, which read:

"The President shall vote only in case of a tie."

Senate Rule 26 remained unchanged until 1961, at which time the parenthetical reference "(See Rule 55.)" was incorporated therein. Senate Rule 26 was not changed again until the State Senate of the 45th Legislative Assembly amended such Rule to its current form:

"26. VOTE BY PRESIDENT

"The President shall vote only in case of a tie with respect to a procedural question. The President shall not vote on final disposition of any measure (See Rule 55)."

We note that Senate Rule 55, in pertinent part, has remained unaltered since Statehood until its amendment by the current State Senate during the 45th Legislative Assembly.

Our examination of the historical application of §§ 65 and 77 of our Constitution, as such sections relate to tie-breaking votes in the State Senate on the final consideration of bills, reveals a long-continued legislative practice of not allowing the Lieutenant Governor, as President of the Senate, to cast tie-breaking votes on final consideration of bills. During the period from 1889 through 1945, ten tie votes occurred in the State Senate during the final consideration of bills.[4] Of these tie votes, in only one instance did the Lieutenant Governor cast a tie-breaking vote.[5] During the 1889–1945 period, numerous tie votes occurred in the State Senate on procedural matters, on which procedural matters the Lieutenant Governor regularly cast either affirmative or negative tie-breaking votes. Our analysis of the Senate Journal records for the 1889–1945 period, with only one exception, reveals that prior to the issuance of the Attorney General's opinion of February 19, 1945, it was the practice of the Lieutenant Governor to refrain from casting a tie-

**4.** Pertinent tie votes in the State Senate occurred in 1897, 1923, 1927, 1929 (2 tie votes), 1933 (3 tie votes), 1937, and 1945.

**5.** Such vote occurred on February 21, 1923. Such vote was not challenged and when the bill

was considered by the State House of Representatives, it was indefinitely postponed—preventing subsequent challenge. (1923 S.J., pp. 857, 1099.)

breaking vote on the final consideration of a bill.

In conformity with the Attorney General's opinion of February 19, 1945, no Lieutenant Governor attempted to cast a tie-breaking vote on the final consideration of a bill until after such opinion was reversed by the Attorney General's opinion of February 18, 1975. As one newspaper reported, following the defeat by a tie vote of an educational television funding bill:

"Sanstead, a teacher who had testified in favor of the measure, said that precedent had kept the Senate's presiding officer from voting in such cases." *Bismarck Tribune,* February 13, 1975.

Since the issuance of the Attorney General's opinion of February 18, 1975, Lieutenant Governor Sanstead has attempted to cast a tie-breaking vote on every tie vote in the State Senate during the 1977 Session of the Legislature, whether such tie vote occurred on the final consideration of a bill or not—thus leading to the present controversy as a result of the State Senate having changed its Senate Rule 26 so as to prohibit the Lieutenant Governor from voting to break a tie except on procedural matters.

■ Based on the foregoing, it is this Court's opinion that this State established a long-standing practice not to allow the Lieutenant Governor, as President of the Senate, to cast a tie-breaking vote on the final consideration of a bill. We further note that such practice has gone unchallenged, even after the issuance of the Attorney General's opinion of February 19, 1945, until such opinion was reversed by the Attorney General's opinion of February 18, 1975. We choose not to reverse such a long-standing practice merely because two out of four other jurisdictions, with different historical legislative developments, adopted a contrary ruling for their jurisdictions.

With this historical background we now consider the two constitutional provisions involved here, namely §§ 65 and 77 of the State Constitution. In construing these provisions we must also take into account the purposes and objectives sought in adopting the Constitution.

The original provision of § 25 of the North Dakota Constitution simply and succinctly stated:

"The legislative power shall be vested in a senate and house of representatives."

(This section has since been amended by adding a number of provisions, including that the people have reserved to themselves the power of the initiative and referendum.) The original provision did not imply that the Lieutenant Governor was a member of the State Senate.

In determining what constitutes the Senate, we go to § 26 which originally provided:

"The senate shall be composed of not less than thirty nor more than fifty members."

(This section has been amended and, as amended, has been declared unconstitutional.) No mention is made of the Lieutenant Governor.

Section 27 provides for the terms of the Senators to be four years. By comparison, the original Constitution provided for a two-year term for the Lieutenant Governor.

Section 28 requires a Senator to be 25 years of age and a resident of the State for two years. By comparison, the Lieutenant Governor must be 30 years of age and must have resided in the State five years next preceding his election.

In reviewing and by comparing these provisions and analyzing them, it can be readily seen that the Lieutenant Governor is not, and was never intended to be, a member of the Senate, but was considered a member of the executive branch of government who was assigned the duty of presiding over the Senate.

■ There is no language in the North Dakota Constitution which suggests that any other member of the executive branch of government, except the Governor, has any substantive authority over bills—as to whether or not they should become law. In

the absence of such specific language, similar to that found in § 79 relating to the Governor, we cannot conclude that the framers of the North Dakota Constitution intended to give another member of the executive branch of government, in addition to the Governor, authority over legislative functions as to whether or not any bill should or should not become law.

In construing constitutional provisions, we must make every effort to take into account the entire Constitution. *State ex rel. City of Minot v. Gronna,* 79 N.D. 673, 59 N.W.2d 514 (1953). Generally, principles of construction applicable to statutes are also applicable to constitutional provisions. *Northwestern Bell Telephone Co. v. Wentz,* 103 N.W.2d 245 (N.D.1960); 16 C.J.S. *Constitutional Law* § 15; *State ex rel. Walker v. Link,* 232 N.W.2d 823 (N.D.1976).

In construing and interpreting the Constitution we must give effect and meaning to every provision and reconcile, if possible, apparently inconsistent provisions. *State v. Sherman,* 63 N.D. 9, 245 N.W. 877 (1932).

This principle has been restated in 16 C.J.S. *Constitutional Law* § 23, pages 91–96:

"In ascertaining both the intent and general purpose, as well as the meaning, of a constitution or a part thereof, it should be construed as a whole. As far as possible, each provision should be construed so as to harmonize with all the others, with a view to giving effect to each and every provision in so far as it shall be consistent with a construction of the instrument as a whole.

"All constitutional provisions have equal dignity. The presumption and legal intendment is that each and every clause in a written constitution has been inserted for some useful purpose, and courts should avoid a construction which would render any portion of the constitution meaningless. Different sections, amendments, or provisions relating to the same subject, or of the same matter so that they can be said to be in pari materia, are to be construed together and read in the light of each other."

See also, 16 Am.Jur.2d *Constitutional Law* §§ 66 and 67, pages 242, 243.

On this topic, 16 Am.Jur.2d *Constitutional Law* § 60, pages 232–233, states:

"Constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action. Thus, a cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, even though the circumstances may have so changed as to make a different rule seem desirable. In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Moreover, the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders."

In addition to the foregoing, we have also compared our constitutional provisions relating to the Lieutenant Governor and the Senate with those of the United States Constitution relating to the Vice President and the Senate, and find that the United States Constitution, Article I, § 3, is similar to the North Dakota provision in § 77, but the United States Constitution does not have a provision similar to § 65 of the North Dakota Constitution, which provision requires a majority of the members-elect of each House in order to pass a bill.

We therefore may not rely upon the practices prevailing in the United States Senate and any argument that the Vice President is permitted to vote on all ties in the United States Senate is not persuasive as applying

the same to the Lieutenant Governor of the State of North Dakota.

We have also analyzed the argument that a necessity exists to break a tie. Such an argument is not persuasive because a tie-breaking vote could be either a "yes" or "no" vote, and if the tie is not broken it would be the equivalent of a "no" vote because the bill would fail because of the lack of a majority.

■■■■ In applying the foregoing principles of law, and by harmonizing § 65 with § 77 of the North Dakota Constitution which we must, we reach the resulting conclusion that § 77 in effect means that the Lieutenant Governor shall have no vote unless they be equally divided except on such matters in which the Constitution provides otherwise. Sections 65 and 202 of the North Dakota Constitution, and Article V of the United States Constitution, provide otherwise. By reaching this conclusion we have given meaning and significance to every provision of the Constitution. For all the reasons stated herein, we hold that § 65 of our Constitution acts as a specific limitation on § 77 of our Constitution, prohibiting the Lieutenant Governor, as President of the Senate, from casting a tie-breaking vote on the final consideration of a bill in the State Senate.

■■■■ Having thus determined our State's historical resolution of the apparent conflict between §§ 65 and 77 of our Constitution, we now can test the constitutionality of Senate Rule 26 of the 45th Legislative Assembly. We note that Senate Rule 26 limits the Lieutenant Governor's tie-breaking vote to only procedural questions, and that it bars his vote on "final disposition of any *measure*". (Emphasis added.) We find the use of the word "measure" in Senate Rule 26 to encompass legislative actions and enactments in addition to those enactments that are properly labeled as "bills". In Black's Law Dictionary 4th Ed. Rev., page 209 (1975), the word "bill", as it is used in legislation and constitutional law, is defined, in pertinent part, as:

"The word means a draft of an act of the legislature before it becomes a law; a proposed or projected law. A draft of an act presented to the legislature, but not enacted. . . ."

Further, we note that pertinent cases cited in Words and Phrases, Vol 5, *Bill,* pp. 630–634 (1968), base their determination of whether a measure is a bill upon whether, when passed by both Houses of the Legislature and signed by the Governor, it has the full force of law.

■■■■ As joint or concurrent resolutions neither proposing amendments to the State Constitution or proposing or ratifying amendments to the Federal Constitution do not have the full force of law—they cannot be considered "bills" within the language of § 65 of our Constitution and thus must be excluded from the prohibition in Senate Rule 26.

■■■■ Resolutions proposing amendments to the State Constitution are subject to the provision of Article XV, § 202 of our State Constitution. It reads in pertinent part:

"Any amendment or amendments to the constitution of the state may be proposed in either house of the legislature, and if the same shall be agreed to upon roll call *by a majority of the members elected to each house,* it shall be submitted to the electors and if a majority of the votes cast thereon are affirmative, such amendment shall be a part of this constitution." [Emphasis added.]

As the language of Article XV, § 202 of the State Constitution is similar to the language of § 65 of our State Constitution, we consistently hold that Senate Rule 26 is valid as to votes on the final disposition of such resolutions.

■■■■ Resolutions proposing amendments or ratifying amendments to the United States Constitution are subject to Article V of the United States Constitution. The pertinent part of Article V reads:

"The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution,

or, *on the Application of the Legislatures of two thirds of the several States,* shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when *ratified by the Legislatures* of three fourths of the several States . . ." [Emphasis added.] Also, consistent with what we have said herein, we hold that the Lieutenant Governor, not being a member of the State Senate, may not vote on the final disposition of such resolutions.

█ For the reasons stated herein, we hold that Senate Rule 26 of the 45th Legislative Assembly, as Senate Rule 26 applies to the final disposition of a "bill" is constitutional. Senate Rule 26 is also constitutional as to votes on final disposition of resolutions proposing amendments to the State Constitution and to votes on final disposition of resolutions proposing or ratifying amendments to the United States Constitution. Senate Rule 26 is not constitutional as to other resolutions.

The writ is denied insofar as we have found the rule constitutional, and granted to the extent that we have found it unconstitutional.

ERICKSTAD, C. J., and SAND, J., concur.

VOGEL, Justice, dissenting in part and concurring in part.

I dissent, for reasons which a mere reading of the majority opinion should make evident. Part I of that opinion says correctly, in my view, that it is our duty to decide the question involved in this case (especially since the tie-votes anticipated at the time of submission have since occurred). But Part II abdicates our responsibility and tells the Legislature it can keep on doing what it has been doing because it has been doing it. To let a shifting legislative majority decide constitutional issues is nothing but an abdication of this Court's duty to decide those issues.

Furthermore, it is not even logical to say that the Legislature has had a consistent practice through the years. If the Lieutenant Governor has declined to break ties nine times out of ten in the last 88 years, that fact does not necessarily mean what the majority here thinks it does. If the Lieutenant Governor is faced with a tie-vote, he has three choices, not two. He may vote aye, in which case the bill passes. He may vote nay, in which case it is lost. Or he may pass his vote, in which case, again, it is lost. Thus, if he wants the bill to lose, he may either vote nay or pass his vote. Either way, the result will be the same. To say that passing his vote is a recognition that he has no power to vote is simply not correct. It may mean simply that he wanted the bill to die, and chose one of the two available alternative methods to kill it.

I will return to the majority opinion under Point X, below. First, I will discuss (as the majority refuses to do) the interpretation of the constitutional provisions involved in this case.

I

Article I, Section 3, of the Constitution of the United States, says, in part:

"The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided."

The pertinent part of Section 77 of the Constitution of North Dakota, as originally adopted, read:

"The lieutenant governor shall be president of the senate, but shall have no vote unless they be equally divided. . . ."

An amendment to Section 77 of our Constitution was adopted by the voters in 1974, and reads:

"The *powers and duties of the* lieutenant governor shall be *to serve as* president of the Senate, but *he* shall have no vote unless they be equally divided. . . ." [New language italicized.]

The Constitution of the United States was adopted in 1789, and from then until now, the Vice President has broken tie-

votes on all measures, substantive and procedural, before the United States Senate. When the North Dakota Constitution was adopted, in 1889, its draftsmen used identically the same words used in the United States Constitution as to the breaking of ties. The authors of the North Dakota Constitution had the benefit of 100 years of experience with the practice of the United States Senate, and used the language of the United States Constitution, knowing exactly what it meant, and knowing that the presiding officer in the North Dakota Senate would break tie-votes just as the presiding officer of the United States Senate had done for 100 years.

The power of the Vice President to break ties was understood when the United States Constitution was adopted. In "The Federalist," No. 88, Alexander Hamilton gave as a reason for having an outside person, not a Senator, act as presiding officer:

" . . . To secure at all times the possibility of a definite resolution of the body [the Senate], it is necessary that the president should have only a casting vote." [1]

## II

The use by the North Dakota Constitutional Convention of the language of the United States Constitution was intentional, not inadvertent. The first draft of the North Dakota Constitution provided that the Lieutenant Governor would have a "casting vote," which has the same meaning as the language ultimately adopted. See fn. 1, *supra*; Journal, Constitutional Convention, p. 90. Nevertheless, the Committee on Revision and Adjustment of the convention recommended striking the words "only a casting vote" and adding "but shall have no vote unless they be equally divided." Journal, p. 228. This change was adopted by the entire membership of the convention. Journal, p. 281.

## III

Coming now to the supposed conflict between Section 65 of the Constitution, providing for passage of bills by a "majority of all the members-elect," and Section 77, providing that the Lieutenant Governor has a vote when the body is equally divided, it is apparent to me that Section 65 was intended to relate to an entirely different subject—the question of whether a bill or resolution could be passed by a majority of a quorum (which could be as few members as one more than 25 percent of the total) or whether it was to be passed by a majority of the members-elect (meaning as few as one more than half of the elected members). That this analysis is correct is proved by the Journal of the convention. The so-called "Williams Draft," which was largely followed in the drafting of the Constitution, provided in Article XI, Section 42 [Journal, pp. 83–84], that bills be passed by a "majority of all members present." The Committee on the Legislature made no change, and recommended the language as part of Section 42 [Journal, p. 141]. The change to "majority of all the members-elect" was made by the Committee of the Whole on August 2, 1889 [Journal, p. 179]. The Committee on Revision and Adjustment made no change in the language, but made it a part of Section 65 [Journal, p. 225], and this language was adopted by the convention [Journal, p. 280].

## IV

If there is a conflict between Section 65 and Section 77, it can be resolved in several ways. One way of resolving such a conflict is to determine which measure was passed at a later time, and rule that the later in time prevails. *State ex rel. Walker v. Link*, 232 N.W.2d 823 (1975); Sec. 1–02–09, N.D. C.C. Under this rule, too, Section 77 will prevail, since it was approved at a later

1. "CASTING VOTE. Where the votes of a deliberative assembly or legislative body are equally divided on any question or motion, it is the privilege of the presiding officer to cast one vote (if otherwise he would not be entitled to any vote) on either side, or to cast one additional vote, if he has already voted as a member of the body. This is called the 'casting vote.' *Brown v. Foster*, 88 Me. 49, 33 A. 662, 31 L.R.A. 116."—Black's Law Dictionary.

hour, although on the same day, than Section 65 was approved. The Journal shows that both were approved on August 14, 1889, but Section 77 came later in the day. The approval of Section 65 is on page 280 of the Journal, and the approval of Section 77 is on page 281 of the Journal. Earlier, the Committee on Revision and Adjustment had followed the same order, approving Section 65 on August 13 [Journal, p. 225], and Section 77 on the same day, but later, as shown on page 228 of the Journal.

## V

An additional reason for holding that Section 77 prevails is the fact that the language of Section 77 was reapproved by the voters of North Dakota in 1974, without changing the meaning of the section. The Legislature, in 1973, by Chapter 531, Session Laws of 1973, proposed an amendment to Section 77, leaving unchanged the language as to the tie-breaking power of the Lieutenant Governor. That amendment was approved on November 5, 1974, and is presently part of the Constitution. Thus the voters, in 1974, ratified and reapproved the language of the Constitution as to the tie-breaking power of the Lieutenant Governor. This alone should prove that Section 77 prevails over Section 65. See, again, *State ex rel. Walker v. Link, supra.*

## VI

The conflict between Sections 65 and 77 can be readily resolved, giving effect to both, by simply holding that the Lieutenant Governor is a member-elect of the Senate for the limited purpose of breaking ties. So construed, both sections are given full effect, and both are treated as of equal importance. It is our duty to construe the Constitution so as to reconcile its provisions, if possible.

This construction is supported by language elsewhere in the Constitution, indicating that the Lieutenant Governor is a member of the Senate for some purposes.

Section 195 of the Constitution says:

"All impeachments shall be tried by the senate. . . . No person shall be convicted without the concurrence of two-thirds of the members elected. . . ."

Section 199 says:

"On trial for impeachment against the governor, the lieutenant governor shall not act as a *member* of the court." [Emphasis supplied.]

Thus the Lieutenant Governor is a member of the Senate, acting as court of impeachment, and I believe he is a member-elect of the Senate for the purpose of breaking ties.

## VII

Coming now to the case law from other States, I submit that it favors the interpretation that the presiding officer may break all ties. There are four decisions from other States, two each way. *Opinion of Justices,* 225 A.2d 481 (Del.1966); *State ex rel. Easbey v. Highway Patrol Board,* 140 Mont. 383, 372 P.2d 930 (1962); *Coleman v. Miller,* 146 Kan. 390, 71 P.2d 518 (1937); *Kelley v. Secretary of State,* 149 Mich. 343, 112 N.W. 978 (1907). The two older cases hold that the Lieutenant Governor may not break ties, while the two more recent cases hold that he may.

More important, the two later cases, Delaware and Montana, discuss the issues judiciously and completely, while the two older cases, Kansas and Michigan, do not. The Montana case points out that the Michigan case was decided without any citation of authority and after little consideration. The opinion was issued the second day after submission. 112 N.W., at 978.

The Kansas decision is really dictum, so far as our question is concerned. It was decided primarily on the point that ratification of a constitutional amendment is a Federal function, not the passage of a bill or joint resolution, and therefore there was no question as to the Lieutenant Governor's right to vote. The rest of the opinion is unnecessary dictum.

Furthermore, the Montana and Delaware courts gave consideration to the older cases

and found them unconvincing. The Delaware court said, at page 485:

"We have considered *Kelley v. Secretary of State,* 149 Mich. 343, 112 N.W. 978 (1907) and *Coleman v. Miller,* 146 Kan. 390, 71 P.2d 518 (1937). We find those cases unpersuasive."

The Montana court said that the Michigan opinion was arrived at " . . . by strained and unwarranted construction . . . ." 372 P.2d 930, at 944. I agree.

## VIII

The Attorney General of North Dakota also finds the older cases unpersuasive. On February 18, 1975, he gave an opinion to the Lieutenant Governor, reversing a previous opinion, and concluding with these three paragraphs:

"Although we are reluctant to withdraw a previous opinion of this office, in our opinion appellate court holdings since the 1945 opinion are persuasive and require, under these specific circumstances, a contrary opinion. Two such cases are illustrative of court interpretation of this difficult issue since the February 19, 1945 opinion. They are *State ex rel. Easbey v. The Highway Patrol Board,* 140 Mont. 383, 372 P.2d 930 (1962), and *Opinion of the Justices* (Supreme Court of Delaware), 225 A.2d 481 (1966).

"Both of these cases considered the precise issue at hand under constitutional language substantially the same if not precisely the same as contained in the North Dakota Constitution. Both decisions were unanimous by the highest appellate courts of Montana and Delaware. Both cases held that the lieutenant governor has the power to vote on bills when the Senate is equally divided.

"While there are some cases that indicate a contrary holding, they were decided prior to the two cases cited herein and considered unpersuasive by the Montana and Delaware Courts. We believe the recent decisions by the Montana and Delaware Courts are indicative of the current judicial attitude on the question. Accordingly in direct answer to your question, it is our opinion that the lieutenant governor may cast the deciding vote on the final passage of a bill."

## IX

The argument made by the respondents that the Lieutenant Governor is a member of the executive branch of government, not the legislative branch, is really irrelevant. I mention in passing that nowhere in the North Dakota Constitution is there a statement that the three branches of government are separate or independent. Even aside from that fact, however, and recognizing that for most purposes they are distinct, we still realize that the Constitution provides that many functions are to be performed by representatives of two or more of the three branches of government. There are many areas of overlapping powers of those three branches.[2] A few examples will suffice to prove this point:

The Governor has a veto power [N.D. Const., Sec. 79]; the membership of the Board of Pardons includes the Chief Justice (judicial branch) as well as the Governor (executive branch) [N.D.Const., Sec. 76]; the membership of the Reapportionment Commission includes the Chief Justice (judicial branch), the Attorney General and the Secretary of State (executive branch), and the majority and minority leaders of the House of Representatives (legislative branch) [N.D.Const., Sec. 35]; and the Senate (legislative branch) has the judicial duty of trying impeachments [N.D.Const., Sec. 195].

## X

I return now to the majority opinion. As I pointed out in the introduction, it abdicates our responsibility. It decides the case almost exclusively on one basis alone: the

**2.** The same situation existed in State constitutions at the time of the adoption of the United States Constitution. See "The Federalist," No. 47, written by Madison.

claimed existence of a long-continued constitutional interpretation by the Legislature of its own powers.

"Long-continued interpretation" is not a rule of construction; it is an "aid to interpretation and can be overriden by other more compelling considerations." 2A Sands' Sutherland Statutory Construction, Sec. 49.07, p. 252. For other possible aids to construction or canons of construction, see Karl N. Llewellyn, *The Common Law Tradition/Deciding Appeals* (Boston, Toronto: Little, Brown and Company, 1960), Appendix C, p. 521, for a list of 45 "Canons of Construction" which are often contradictory. Included in the list is the canon cited by the majority, and with it the contrary rule that "The court is not bound by an administrative construction," citing *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587 (1922).

Of course, this Court has used the canon of long-continued interpretation as an aid to construction in the past. The majority opinion cites several such cases. But a reading of them shows that the canon was used as an aid, along with other analyses, in arriving at a decision. The present case is the first, so far as I can tell, to rely almost entirely upon the canon in reaching a decision. It is also the first time that the Legislature's (or the Lieutenant Governor's) acts interpreting the extent of the Senate's powers has been held solely determinative of those powers.

This Court has also refused to follow the same canon in other cases. If "long-continued interpretation" were as sacrosanct as the majority opinion makes it, we would have had to decide differently such cases as *Kuhn v. Beede*, 249 N.W.2d 230 (N.D.1976), where the previous *judicial* construction was that absent voters ballots not initialed and stamped would be counted [see my dissent]; and *Kitto v. Minot Park District*, 224 N.W.2d 795 (N.D.1974), where previous judicial and legislative interpretation was that governmental subdivisions were immune from tort liability. The list could be extended indefinitely.

The very paragraph quoted by the majority from 16 C.J.S. *Constitutional Law* § 34, gives as a reason for the consideration given to continued interpretation:

"The injustice that would inevitably result by the disturbing of such constructions after a long period of acquiescence therein, during which many rights will necessarily have been acquired, is a very strong argument against it." 16 C.J.S. p. 113.

There has been no suggestion that any rights have been acquired by the nonvoting of the Lieutenant Governor.

The same paragraph also says that such construction is not controlling [pp. 113–114]; that "plain, direct, and unambiguous provisions of a constitution cannot be modified or amended by practice or custom, no matter how long continued"; and that the weight of the interpretation depends in part "on the number of instances in the execution of the law in which opportunity for objection in the courts or elsewhere is afforded." Nine times in 88 years is not many.

Furthermore, as the majority opinion shows, the *first* time the Senate ever had a rule forbidding the Lieutenant Governor to vote on all but procedural matters was during the *current* (45th) Legislative Assembly. Thus the present challenge by Lieutenant Governor Sanstead was the first possible challenge to a Senate rule on constitutional grounds. Contemporaneous construction of former ambiguous rules has no bearing on the constitutionality of a subsequent rule, mandatory in terms.

What all of this means, of course, is that we have a duty to consider all the aids to construction, including the history of the constitutional provision, the help we can get from other courts which have been faced with the same question, the opinion of the Attorney General (by which the Legislature should have been bound while this appeal was pending, but which it ignored), and every other aid to an intelligent and reason-

able resolution of the problem we can find.[3] We should not pick out one canon of construction from among dozens of often-contradictory ones and say we have the answer. Where the majority describes the analysis of the Constitution and precedents made in the Attorney General's opinion [see VIII, *supra*] and the Montana and Delaware Supreme Courts' opinions [see VII, *supra*] as an "abstract legal argument over the application of legal doctrines of constitutional construction," it airily renounces the methods of constitutional interpretation used by the better appellate courts from the days of John Marshall to the present. Instead, it apparently proposes that we should hereafter select one of many often-conflicting alternative canons of construction. This approach is an example of what Professor Karl N. Llewellyn called the Formal Style of writing opinions and which he found deplorable. See *The Common Law Tradition, supra,* pp. 5, 38. It was prevalent during the period when the Michigan and Kansas cases were written (1907 to 1937).

The Formal Style is characterized, says Llewellyn, by opinions which "run in deductive form with an air or expression of single-line inevitability. 'Principle' is a generalization producing order which can and should be used to prune away those 'anomalous' cases or rules which do not fit, such cases or rules having no function except, in places where the supposed 'principle' does not work well, to accomplish sense—but sense is no concern of a formal-style court." *The Common Law Tradition,* supra, p. 38.

The result of this approach is what Llewellyn, paraphrasing Pound and Parke, describes as "one in which by the employment of pure legal reasoning one arrived inescapably at a conclusion which no layman could possibly have foreseen." The *Common Law Tradition, supra,* n. 31, p. 39.

The majority opinion in the present case starts with the "principle" that continued interpretation by a legislature is controlling, and from that faulty premise inexorably arrives at the conclusion which no laymen (and few lawyers) could possibly have foreseen: that a Lieutenant Governor cannot break ties, even though he is also president of the Senate.

Finally, on the question of what weight, if any, should be given to the canon of contemporaneous construction, I mention the fact that none of the four other Supreme Courts which have been faced with the same question [see VII, above] considered the canon of construction important enough to mention, and certainly did not rely on it. Neither should this Court.

## CONCLUSION

If there is a conflict between Section 65 and Section 77, there are generally recognized ways of resolving that conflict. By every standard, Section 77 should prevail. One standard is that each should be interpreted in connection with the purpose for which it was passed. Section 65 relates to the question of how many votes are required to pass a bill (majority of a quorum or majority of members-elect), while Section 77 relates to the tie-breaking power of the Lieutenant Governor. Another way of resolving the conflict is to decide which is a general provision (Section 65) and which is a specific provision (Section 77). Another is to look at the time when each was approved, and give recognition to the one passed later in time. Again, Section 77 prevails, because it was approved later in the Constitutional Convention and because it was reapproved by the voters of North

---

**3.** For example, see Section 1–02–39, N.D.C.C., listing seven *"Aids in construction of ambiguous statutes,"* one of which is: "6. The administrative construction of the statute." The others are:
"1. The object sought to be attained.
"2. The circumstances under which the statute was enacted.

"3. The legislative history.
"4. The common law or former statutory provisions, including laws upon the same or similar subjects.
"5. The consequences of a particular construction.
"6. . . .
"7. The preamble."

Dakota in 1974. And because the history of the Constitutional Convention shows that the language of Section 77 was deliberately chosen to conform to the United States Constitution, using language under which ties are broken by the vote of the Vice President, the conflict can be resolved, giving effect to both provisions, by holding that the Lieutenant Governor is a member of the Senate for the limited purpose of breaking ties.

For all of the reasons I have given in this dissenting opinion, I believe the majority is in error and that the Lieutenant Governor has now, and always has had since the Constitution was adopted in 1889, the power to break all ties, whether substantive or procedural, in the Senate of North Dakota.

PEDERSON, Justice (dissenting).

This Court can give the Senate neither a binding nor advisory opinion.

In *State v. Blaisdell,* 22 N.D. 86, 132 N.W. 769 (1911), syllabus 1, this Court said:

"The people, through the Constitution of this state, have created three departments of government, each supreme in its own sphere."

Later, in *City of Carrington v. Foster County,* 166 N.W.2d 377, 382 (N.D.1969), the Court explained that " * * * there is an implied exclusion of each branch from the exercise of the functions of the others." That ought to settle the question of whether the Senate would have to change its rules just because the Supreme Court said so—obviously our opinion would not be binding. The majority opinion correctly concludes that the record of the First Constitutional Convention discloses that a proposal that the Supreme Court render advisory opinions was specifically rejected.

In *State ex rel. Olson v. Thompson,* 248 N.W.2d 347 (N.D.1976), we prevented a district judge from interfering in a legislative function. It is true that the majority did not decide to do that because of the doctrine of separation of powers. That is why I couldn't concur in anything but the results in that case.

*Kuhn v. Beede,* 249 N.W.2d 230 (N.D. 1976), involved the same basic dispute as *Olson v. Thompson, supra,* and resulted in a judicial determination of a question specifically reserved to the Legislature (who shall be seated) even though there were three objecting justices. Only two of the objections related to jurisdiction.

It is not uncommon to find yourself on the minority side when you believe that the judiciary cannot and should not attempt to settle every dispute that arises. See, for example, the following dissents: Justice Murphy in *State ex rel. Palmer v. Perpich,* 289 Minn. 149, 182 N.W.2d 182 (1971), a case which happened to also involve voting rights of the lieutenant governor; Justice Stewart in *Powell v. McCormack,* 395 U.S. 486, 559, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); and Justice Sand in *Kuhn v. Beede, supra.*

"Has the U.S. become a nation run by its courts rather than its legislators? Many experts think so, and the result is a legal quagmire." Newsweek, January 10, 1977.

In the past the courts made special effort to decline jurisdiction in the area of legislative deliberations. *Kerr v. Trego,* 47 Penn. St.Rep. 292 (Wright 11) (Philadelphia 1864), involved a dispute between two groups, each of which organized a Common Council of the City of Philadelphia. The Supreme Court of Pennsylvania granted a preliminary injunction because of the "immense importance" of the case which required the "speedy determination" of a "very unpleasant difficulty" in order to prevent a "great detriment of the public interest."

That opinion, written by Chief Justice Lowrie, pointed out that not all wrongs can be redressed by the courts and that " * * * all bodies, except the supreme legislature, are under law * * *."

"The courts can never apply it [the test of laws, custom and usage] to division in the supreme legislature, because that body is subject to no judicial authority, and cannot be." *Kerr v. Trego, supra.*

Justice Nelson, concurring specially in *State v. Essling,* 268 Minn. 151, 128 N.W.2d

307, 319 (1964), while discussing parliamentary rules, said: "They may be waived or disregarded by the legislative body, and courts have no concern with their observance."

"A rule of parliamentary law is a rule created and adopted by the legislative or deliberative body it is intended to govern. It is different from a provision of the constitution, which the people have set up as defining and limiting the powers and duties of the legislature." 67 C.J.S. Parliamentary Law, § 1.

" * * * the fact that it [the Legislature] violates one of the rules so adopted may not invalidate a measure passed in compliance with statute." 67 C.J.S. Parliamentary Law, § 3(b).

"The courts will not disturb the ruling on a parliamentary question made by a deliberative body having all the necessary authority to make rules for its governance and acting within the scope of its powers." 67 C.J.S. Parliamentary Law, § 6.

The question here is whether more than a dispute over parliamentary matters has been raised. As matters stood at four o'clock in the afternoon of January 28, 1977, when this case was presented to us, there was no question of great public interest pending other than a great curiosity over which party would win the political dispute. The sovereignty of the State was not threatened nor were the franchises, prerogatives, or liberties of the people of North Dakota threatened. These are the rules for determining jurisdiction. See *State ex rel. Steel v. Fabrick,* 17 N.D. 532, 117 N.W. 860 (1908), and The Prerogative Jurisdiction of the Supreme Court by former Chief Justice Thomas J. Burke, 32 N.D. Law Review 199.

We are apparently asked to determine that the public has such a vested interest in every bill that is introduced by the legislators which would warrant examination by this Court into matters such as how and why any bill may fail to become law, if that is its fate. The lieutenant governor does not assure us that he will vote "aye" on all tie votes. On those bills that become law

by virtue of his tie-breaking vote, if there be any, we can test their validity when a proper case is brought in the courts.

The majority opinion gives great emphasis to events which have occurred subsequent to the presentation of this case to us. Additionally, at the eleventh hour, the attorney general urges that we be sure to take note of the turn of events, which raises great concern in his office. Because he has issued an advisory opinion which the Senate refuses to abide by, he wants the Court to issue an advisory opinion (which, in my opinion, the Senate can also ignore).

I do not intend to create an impression that under no circumstances should the Court intervene in the internal affairs of the legislative assembly or of the executive branch. It would, however, require a concern of momentous proportion. The federal courts' experience with the *Nixon Tape* cases (D.C., 360 F.Supp. 1; 159 U.S.App. D.C. 58, 487 F.2d 700; 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039), illustrates the power of the court when the threat to government is great. In the absence of that kind of threat, the Court should exercise "utmost deference." See *U. S. v. Burr,* 25 Fed.Cas. No. 14,694, p. 187.

The writ in this case should properly be denied, but without the advisory opinion.

Because the majority opinion, without saying so, apparently concludes that there is no jurisdictional question worthy of note, I am compelled to comment on the reasoning on the merits. The reliance upon contemporaneous and practical construction, almost to the exclusion of all other rules of interpretation, is faulty.

In *Kuhn v. Beede, supra,* the majority applied the rule that mandatory language takes precedence over directory language. We have often said that we would give deference to attorney general's opinions which are based upon sound reasoning. Section 1–02–09, NDCC, contains a rule applicable to reconciliation of incompatible provisions in the Constitution. All of the rules of construction applicable to statutes are also applicable to the Constitution. See §§ 1–02–38 and 1–02–39, NDCC. Some of

the rules were used in *Walker v. Link,* 232 N.W.2d 823 (N.D.1975), and in the cases cited therein.

If the question presented is of such significance as to warrant the exercise of this Court's prerogative jurisdiction, then the question should be examined from every possible approach. The parties rushed the question to us without comprehensive research and analysis. They were pressured, as is this Court, to act quickly, before something catastrophic occurs. Apparently the worst that could happen has now happened—the Lieutenant Governor has violated Senate Rule 26. The Senators sought the advice (again) of the attorney general. This would appear to be their proper course of action. If this case were merely dismissed, the attorney general could prescribe a course to be followed. If it is an emergency situation, the attorney general is as qualified to give an "off-the-cuff" advisory opinion as is the Court. If a considered, long-range solution is necessary, Senator Holmberg's proposal that the voters be allowed to decide upon a constitutional amendment is the proper course.